PUBLISH

UNITED STATES COURT OF APPEALS

**Filed 8/6/96**

TENTH CIRCUIT

—————

MID-WEST CONVEYOR CO., INC.,     )
                                             )
          Plaintiff-Appellee,       )
                                           )     No. 95-3073
   v.                               )
                                           )
JERVIS B. WEBB COMPANY,       )
                                           )
          Defendant-Appellant.   )

—————

Appeal from the United States District Court
for the District of Kansas
(D.C. No. 93-2539-EEO)

—————

Carter H. Kokjer of Kokjer, Kircher, Bowman & Johnson, P.C., Kansas City, MO (Devon A. Rolf and Joseph B. Bowman, of Kokjer, Kircher, Bowman & Johnson, P.C., with him on the brief) for Defendant-Appellant.

Charles B. Lyon, of Calfee, Halter & Griswold, Cleveland, OH (Mitchell G. Blair and Maura L. Hughes, of Calfee, Halter & Griswold, with him on the brief) for Plaintiff-Appellee.

—————

Before **TACHA**, **BRORBY**, and **EBEL**, Circuit Judges.

**EBEL**, Circuit Judge.

Appellant Jervis B. Webb Company and Appellee Mid-West Conveyor Company, Inc., are competitors in the business of manufacturing unit handling conveyor systems for various industries, including the automotive industry. Webb holds a patent in the United States, as well as in numerous foreign countries, on an apparently popular conveyor systems technology known as the "wide dog" transfer. Seeking to use its competitor's technology on certain projects, Mid-West licensed from Webb the right to produce and construct conveyor systems incorporating the wide dog technology. The parties now dispute the geographic scope of the license granted. Mid-West argues that Webb granted it a license to use the technology worldwide. Webb argues that the License Agreement is only a grant of a license in its United States patent and, as a result, the license does not grant Mid-West a license under Webb's corresponding wide dog technology patents in other countries.

The district court found the language of the License Agreement to be ambiguous. Considering extrinsic evidence of the negotiation conduct of the parties, as well as their conduct under the Agreement before a dispute arose, the court agreed with Mid-West that the License Agreement granted a worldwide license. Webb now appeals, arguing: (1) The License Agreement unambiguously

grants Mid-West a license limited to use of the wide dog technology only in the United States; and (2) Even if the geographic scope of the Agreement is ambiguous, the extrinsic evidence of the parties' conduct prior to and after entering into the License Agreement indicates that the parties intended to grant Mid-West a license limited in scope to the reach of its United States patent covering the wide dog technology. Because we agree with the district court that the Agreement is ambiguous, and because we conclude that the district court's determination of the parties' intent was not clearly erroneous, we AFFIRM.

## BACKGROUND

Mid-West and Webb are competitors who both manufacture and sell unit-handling conveyor systems. Webb owns United States Patent No. 4,616,570 (the "'570 Patent"), which patents a power and free conveyor system known as the "wide dog" transfer.[1] In addition to the '570 Patent, Webb owns numerous corresponding foreign patents for the wide dog technology disclosed and claimed in the '570 Patent, including patents in Canada and France.

In 1988, Mid-West and Webb competed for a contract to supply conveyor systems to a General Motors plant in Ste. Therese, Canada. GM awarded the contract to Mid-West. Mid-West wanted to use Webb's wide dog transfer

---

[1] The wide dog transfer mechanism is used to transfer objects, such as automobile bodies, from one conveyor to another in conveyor systems.

technology on the job, and negotiated for a license from Webb that would enable it to utilize the technology on the Ste. Therese project. Mid-West argues that at the same time, it also sought a license that would enable it to use the wide dog technology on all future projects, including projects outside the U.S. and Canada.

In February 1989, Webb and Mid-West signed a License Agreement, which was drafted by Webb. The second recital clause of the Agreement states that "MID-WEST desires a non-exclusive license to practice the inventions disclosed and claimed in the Licensed Patent and WEBB is willing to grant such a license to MID-WEST." Paragraph 2 of the Agreement provides:

> License grant. Webb hereby grants to MID-WEST, and MID-WEST hereby accepts, a non-exclusive, non-transferrable license to manufacture, use and sell, or have manufactured for use and sale by MID-WEST, power and free conveyor systems incorporating any invention disclosed and claimed in the Licensed Patent, and such conveyor system being hereinafter referred to as a Licensed System.

Furthermore, the Agreement defines the "Licensed Patent" as "United States Patent No. 4,616,570…." The Agreement does not include any recitation that the license right granted is limited geographically to the scope of the United States patent, nor does the License Agreement include a definition of any territory limiting the geographic scope of the license.

Since signing the License Agreement, Mid-West has paid Webb $286,800 in royalties for foreign jobs which used the licensed technology, including the original Ste. Therese project in Canada, a subsequent project at Ste. Therese, and

-4-

an installation in China. Webb unconditionally accepted these royalties, and never threatened to sue Mid-West for its use of the wide dog technology in foreign countries.

Mid-West's and Webb's differing interpretations of the scope of the License Agreement became apparent in early 1992, when Mid-West considered bidding on a General Motors project in Australia. In preparing Mid-West's bid, Michael McClellan, president of Mid-West, concluded that he needed to ascertain whether Webb owned a patent in Australia, which Mid-West thought might affect whether the company had to pay a license fee under the License Agreement. In response to McClellan's telephone inquiry in early 1992, David Webb Clark, Webb's vice-president, stated that Webb had patent coverage in Australia that would prohibit Mid-West's use of the wide dog technology in that country. Clark also wrote a January 28, 1992 letter to McClellan stating that Mid-West's license was limited to the United States only. Mid-West decided not to include the wide dog technology in Mid-West's bid for the Australian project, purportedly in order to avoid confrontation between Mid-West and Webb and because the small project did not require the wide dog technology.

Webb and Mid-West again competed for an installation in 1992 and 1993, this time for Peugeot in France. Prior to the submission of the bid, Peugeot insisted that the wide dog technology be used. Webb wrote to Mid-West, restat-

ing its position that the License Agreement covered only the '570 Patent in the United States, and did not give Mid-West the right to use that technology in foreign countries where that technology was protected by foreign patent. Mid-West responded that it disagreed with Webb's position and interpreted the License Agreement as granting a worldwide license.

Mid-West then brought this action in United States District Court to resolve whether it could apply the wide dog technology to the Peugeot project under the License Agreement. Mid-West later persuaded Peugeot to use a different technology and amended its complaint to seek only a declaration of the parties' rights under the License Agreement. At trial, the district court found the License Agreement to be ambiguous, and therefore considered extrinsic evidence regarding the Agreement's territorial limitations. Both parties offered testimony by McClellan and Clark, as well as correspondence between Webb and Mid-West and intraoffice memoranda. The district court concluded that, based on the extrinsic evidence, the License Agreement granted Mid-West license rights worldwide.

### I. The Ambiguity of the License Agreement

Both parties initially argue that the License Agreement is unambiguous, and that the clear language of the Agreement supports their respective interpretations.

In considering the Agreement, we keep in mind that patent license agreements are to be construed according to the general principles of contract interpretation and construction. Cardinal of Adrian, Inc. v. Amerock Corp., No. 76-70868, 209 U.S.P.Q. (BNA) 724, 729, 1980 WL 30270 (E.D. Mich. Sept. 8, 1980) (citing 4 Anthony Will Deller, Deller's Walker on Patents, § 421 (1965)), aff'd, 698 F.2d 1218 (6th Cir. 1982).[2] However, inasmuch as the License Agreement involves an invention described in a United States patent, the court also will look to federal decisions interpreting similar license agreements for guidance. See MGA, Inc. v. LaSalle Machine Tool, Inc., 384 N.W.2d 159, 161 (Mich. Ct. App. 1986). Because the determination of whether a contract provision is ambiguous is a question of law, Teton Exploration Drilling, Inc. v. Bokum Resources Corp., 818 F.2d 1521, 1526 (10th Cir. 1987), we review the district court's determination the contract was ambiguous de novo.

Under Michigan law, an agreement is considered ambiguous when its language is susceptible to more than one reasonable interpretation. See SSC Assocs. Ltd. Partnership v. General Retirements Sys. of Detroit, 480 N.W.2d 275, 277 (Mich. Ct. App. 1991); Auto Owners Ins. Co. v. Zimmerman, 412 N.W.2d

---

  [2] The License Agreement has a choice of law provision designating Michigan law as controlling over the Agreement. Kansas law recognizes the enforceability of choice-of-law provisions like the one contained in paragraph nine of the License Agreement. See Equifax Services, Inc. v. Hitz, 905 F.2d 1355, 1360 (10th Cir. 1990).

925, 927 (Mich. Ct. App. 1987).  If an agreement is ambiguous, extrinsic evidence to aid in interpretation or construction of the agreement is admissible. In re Woodcock, 45 F.3d 363, 366 (10th Cir.), cert. denied, 116 S. Ct. 97 (1995).

Webb argues that the License Agreement unambiguously grants Mid-West only a license for the United States '570 patent--not a license to use the invention in countries covered by any of Webb's foreign patents.  Webb relies on language in the first recital clause of the License Agreement stating that "WEBB is the owner of United States Patent No. 4,616,570 … hereinafter referred to as the Licensed Patent."  Furthermore, the Agreement neither refers to nor identifies any foreign rights or patents.  Finally, the License Agreement refers to the Licensed Patent eleven times throughout its text.[3]  Therefore, under Webb's interpretation, because the parties did not explicitly contract for a worldwide license, any corresponding patents Webb holds in foreign countries prohibit Mid-West from using the wide dog technology there.

Mid-West similarly seizes particular language in the License Agreement to support its argument that the Agreement unambiguously grants it a worldwide

---

[3]  For example, Paragraph 4 provides:

In the event that WEBB should subsequently grant to another licensee not affiliated with WEBB a license under the Licensed Patent at a more favorable royalty rate than that provided herein, MID-WEST shall be entitled to obtain such more favorable royalty rate….

license to make, use or sell the technology patented under the '570 patent. First, Mid-West argues that the Agreement contains no express territorial restrictions limiting where Mid-West can make, use or sell the wide dog technology. Second, Mid-West argues that the Agreement's reference to the U.S. patent is only to describe the technology being licensed--not the particular patent being licensed. Specifically, the Agreement's grant clause provides that Webb is licensing to Mid-West a "license to manufacture, use and sell, or have manufactured for use and sale by MID-WEST, power and free conveyor systems incorporating any invention disclosed and claimed in the Licensed Patent, any such conveyor system being hereinafter referred to as a Licensed System." License Agreement ¶ 2 (emphasis added). Consistent with this clause, the second recital clause provides that "MID-WEST desires a nonexclusive license to practice the inventions disclosed and claimed in the Licensed Patent and WEBB is willing to grant such a license to MID-WEST." (emphasis added.)

Federal case law interpreting similar language in other license agreements is sparse, and provides minimal guidance to us in resolving any ambiguity. Webb relies on Cold Metal Process Co. v. United Engineer & Foundry Co., 235 F.2d 224 (3d Cir. 1956). There, a 1927 contract granted United the right to make, use and sell rolling mills "under" Cold Metal's U.S. Patent. Id. at 229. The court held that:

in the absence of any express provision to the contrary, the right thus granted by the contract must be construed to have had the same territorial limitation in its scope as in the case of a patent, that is, the right did not extend beyond the territorial limits of the United States.

Id. In reaching this holding, the court cited no authority other than a reference to a United States statute, 35 U.S.C. § 154, which provides:

Every patent shall … grant [the patent owner] … for the term of seventeen years … the right to exclude others from making, using, or selling the invention throughout the United States.…

Mid-West relies on Kabushiki Kaisha Hattori Seiko v. Refac Tech. Dev. Corp., 690 F. Supp. 1339 (S.D. N.Y. 1988). There, the license agreement granted Hattori a license "to make, have made, use, have used, sell and have sold products coming within the scope of U.S. Patent Nos. 3,855,783…." Id. at 1341 (emphasis added).[4] The court first noted that the language of the granting paragraph "include[d] no terms of geographical restriction limiting to the United States Hattori's right to sell." Id. at 1342. The court then decided that the agreement unambiguously granted Hattori a right to sell the patented inventions that was geographically unrestricted, rejecting Refac's argument that United States patents

---

[4] The license agreement also granted Hattori a license for "all non-U.S. counterparts of any said patents." 690 F. Supp. at 1341. However, Hattori did not argue that its right to sell certain products abroad arose under any foreign patent covered by the agreement. Id. at 1343 n.3. The court, therefore, did not consider the effect of this clause. See id. (stating that "this disputed fact is not material to resolving the issues presented by these motions").

-10-

protect the right only to make, use or sell products within the United States. <u>Id.</u> at 1343. The court rested its decision on the definition of "scope of a patent":

> A patent's "scope," as is well established in patent law, refers not to the geographical area within which the patent provides protection, but to the nature of the products covered by the patent's claims. The term "scope of a patent" has been defined as follows:
>
>> The <u>boundaries or limits of the invention protected by the patent,</u> which are not matters of metes and bounds and can never be defined in the definite sense employed in thinking of physical things, but must be determined by methods based upon established principles of patent law.

<u>Id.</u> (citing <u>Black's Law Dictionary</u> (5th ed. 1979) (emphasis added in opinion)). The court concluded that "Refac has pointed to nothing within the confines of the Agreement to warrant hesitation in concluding that the phrase `within the scope of U.S. Patent…,' as used in the Agreement, carries its usual meaning. Therefore, that phrase does not geographically limit the license granted." <u>Id.</u> (omission in original).[5]

---

[5] There is a split in patent treatises regarding this issue. One treatise, citing <u>Cold Metal</u>, supports Webb's argument:

> In the absence of an express provision to the contrary, the right granted under the license will be assumed to be geographically coextensive with the territorial limitations of the patent. If the license agreement grants the licensee the right to make, use, and sell the patented article, the grant will not be construed to extend beyond the territorial limits of the United States, absent provisions to the contrary.

1 Harold Einhorn, <u>Patent Licensing Transactions</u> § 2.01[2] (1996). <u>See</u> <u>also</u> 6 Ernest B. Lipscomb III, <u>Lipscomb's Walker on Patents</u> § 20:5 (stating that "[i]n the absence of an express provision to the contrary a license must be construed as having the same

(continued...)

Considering the language of the License Agreement, we believe that the Agreement is ambiguous as it could be interpreted to support either party's interpretation. Its references to a specific U.S. patent supports Webb's argument that it only grants a license to use the patent's technology in the United States.[6] However, the lack of any territorial restriction and the Agreement's granting language that the license covers the "inventions disclosed and claimed in the Licensed Patent" supports Mid-West's argument that the Agreement grants Mid-West a license to use the wide dog technology anywhere in the world with the reference to the United States patent only to describe the technology being licensed. Furthermore, we do not believe that the two decisions cited by the

---

[5](...continued)
territorial limit as the patent and does not extend beyond the territorial limits of the United States").

Arguably one treatise may support Mid-West's argument:

If the intent of the parties is to limit the patent rights to be transferred to a specific territory defined in the license agreement, express language and a schedule of licensed patents should be used to negate implications that otherwise arise.

Harry R. Mayers and Brian G. Brunsvold, Drafting Patent License Agreements § 22.08 (1991).

[6] For example, paragraph 4 of the Agreement, quoted supra note 3, apparently grants Mid-West a more favorable royalty rate only when a U.S. Patent licensee obtains such a more favorable rate; the provision does not appear to be triggered if a licensee of a foreign patent obtains a more favorable rate. It seems logical, however, that if Mid-West had bargained for a worldwide patent, it would have bargained for a clause applicable on an international basis as well.

-12-

parties clear up the ambiguity. Cold Metal involved a license agreement granted expressly under a United States patent; there, the subject matter of the license agreement clearly was the United States patent itself, not the technology described in the patent. And although the language of the agreement in Kabushiki--which licensed products "coming within the scope of" a United States patent--seems similar to the language in the present Agreement licensing the "inventions disclosed and claimed" in a United States Patent, the License Agreement's numerous references to the Licensed Patent adds ambiguity to the present License Agreement and distinguishes this case from Kabushiki. Therefore, because we believe the License Agreement fairly could support both Webb's and Mid-West's interpretations, we will look to the evidence in the record and determine whether the district court's determination of the parties' intentions regarding the license's geographic scope at the time the Agreement was drafted was clearly erroneous.

## II. Evidence of the parties' intent

Once a contract provision is found to be ambiguous, the resolution of its proper meaning is a question of fact, subject to review on a clearly erroneous standard. Teton Exploration, 818 F.2d at 1526. "Findings of fact, whether based

on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Fed. R. Civ. Pro. 52(a). See Salve Regina College v. Russell, 499 U.S. 225, 233 (1991). "A finding of fact is not clearly erroneous unless it is without factual support in the record, or if the appellate court, after reviewing all the evidence, is left with the definite and firm conviction that a mistake has been made." Las Vegas Ice & Cold Storage Co. v. Far West Bank, 893 F.2d 1182, 1185 (10th Cir. 1990) (quotation omitted).

Here, the district court concluded that: (1) the negotiations preceding the License Agreement indicate that the parties intended to grant a worldwide license of the wide dog technology; (2) the post-Agreement conduct of Webb further confirms that it considered the License Agreement to grant a worldwide license; and (3) Webb's explicit definition of territorial applications in its foreign licenses indicates that it did not intend to limit Mid-West's license geographically. Considering the evidence in the record, we do not believe that the court clearly erred in deciding that Webb and Mid-West intended a worldwide license.

A.    The conduct of the parties during negotiations

The court determined that Clark, the Webb officer authorized to negotiate and contract with Mid-West, was aware that Mid-West intended that the License Agreement apply to all future projects, including projects outside the United

States. During the negotiations between McClellan and Clark, McClellan expressed interest to Clark in obtaining a license agreement that would apply not only to the Ste. Therese, Canada, project, but to all future projects as well. In a December 19, 1988 letter to Clark, McClellan stated:

> Our thought is that the license would initially cover 89 transfers at the General Motors facility in St. Therese and that it could be extended to other projects on the same basis.

(R.O.A. A98) (emphasis added). In a January 25, 1989 letter to Clark, McClellan repeated Mid-West's position that the license would encompass the Ste. Therese project, and all future projects:

> We have reviewed your letter and would like to offer this counter proposal of $1,200 for each transfer and $100 per carrier or 2 1/2% of the total sell price, whichever is lower. This would provide a fee of $194,400 for the St. Therese project and would be applicable to all future projects.

(R.O.A. A102) (emphasis added).

In response to the January 25 letter, Clark sent McClellan draft copies of a license agreement accompanied by a cover letter dated January 27, 1989. The cover letter stated:

> Enclosed are two copies of a license agreement incorporating terms as outlined in your letter to me dated January 25, 1989 with the exception that we have deleted the royalty payment based on a percentage of sell price.

(R.O.A. A115) (emphasis added). McClellan testified that he interpreted the January 27 letter's incorporation of terms of his January 25 letter--that the agreement would apply to the Ste. Therese project and "would be applicable to all

-15-

future projects"--to mean that the License Agreement was for all future Mid-West projects without territorial limitation. Furthermore, at no time during the negotiation process did Clark, or any other representative of Webb, tell McClellan that Webb construed the scope of the License Agreement as limited to the United States or the Ste. Therese project only.

Furthermore, Clark testified that he understood during negotiations that Mid-West was seeking a license that would permit Mid-West to use the wide dog technology outside the United States and the Ste. Therese project, that the License Agreement accommodated Mid-West's intentions, and that Clark did not discuss any geographic limits on the license with Mid-West:

> Q. And you knew, did you not, sir, that Mid-West Conveyor was looking to use the wide dog everywhere, were you not, sir?
>
> A. I can't say everywhere. I certainly knew they were looking to use it outside of Ste. Therese in Canada and projects in the United States.

(R.O.A. B188.) Later, Clark testified:

> Q. It's true, isn't it, Mr. Clark, that you believed that the language in Paragraph 2 [of the License Agreement] accommodated Mr. McClellan's desire for a license with respect to any future project by Mid-West Conveyor; isn't that correct?
>
> A. That is correct.

(R.O.A. B224.)

Therefore, Mid-West provided a factual basis from which the court could conclude that the parties intended a license applicable to all future Mid-West

-16-

projects. Webb responds to the correspondence and Clark's testimony by arguing that the fact the parties never explicitly discussed the territorial application of the License Agreement indicates that only a United States patent license was intended. However, we consider this argument insufficient to rebut the evidence in the record that Clark was aware that Mid-West sought a license that would apply to "all future projects," including projects outside the United States and the Ste. Therese project.[7]

Webb's argument also ignores the fact that the parties entered into the License Agreement in the context of a Canadian project. We find it difficult to understand how the License Agreement can be restricted to the United States when Webb drafted it in the context of knowingly granting Mid-West the ability to use the technology on a project outside the United States. Webb argues that it needed to grant only a United States license for the Canadian project because the components for the Ste. Therese project were made in the United States, thereby

---

[7] Webb states that Clark's January 27 letter incorporating the terms of McClellan's January 25 letter does not necessarily indicate that Clark understood the license to apply to all future projects. Instead, Webb states that the letter merely acknowledges that the royalty offered in the January 25 letter would apply to "all future projects." Although this interpretation is a plausible one, it does not necessarily suggest that the court's determination that Webb was aware of Mid-West's intentions in seeking a license applicable to all future projects was clearly erroneous. We consider it unlikely that Mid-West would enter a contract that would bind it to a royalty payment schedule on all future projects, without at the same time obtaining the right to engage in such future projects.

triggering the '570 patent.[8]  However, we note that Webb maintains a patent on the wide dog technology in Canada.  Because Webb agreed that this License Agreement allowed Mid-West to use this technology in Canada, it is not obvious why the License Agreement would not allow Mid-West to use the same technology in other foreign countries where Webb held similar patents. Furthermore, a "local content" clause in the contract with GM required that Mid-West manufacture as many of the components for the Ste. Therese project as possible in Canada and, according to Mid-West, parts were made both in Canada and the United States for the conveyor system on the Ste. Therese project.

Considering the correspondence among the parties, Clark's testimony, and Webb's failure to require Mid-West obtain a license under Webb's Canadian patent, we do not believe that the district court clearly erred in concluding that the negotiations prior to  entering the License Agreement indicates that the parties intended for the License Agreement to apply to future Mid-West projects without territorial restriction.

---

[8]  35 U.S.C. § 271(f)(1) provides:

Whoever without authority supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

B.    The post-Agreement conduct of the parties

The court also found that the post-Agreement conduct of the parties supports Mid-West's interpretation of the License Agreement as Webb unconditionally accepted royalties for all of Mid-West's domestic and foreign projects, including royalties for jobs in Canada and China.  Webb offers two explanations for how accepting payments for these projects is consistent with its belief that the Mid-West held only a United States patent license.  First, regarding the Canadian projects, Webb argues that there was no evidence that the materials for the conveyor systems were not produced in the United States.  Therefore, according to Webb, no Canadian license was necessary.  However, as discussed above, this argument is inconsistent with the argument Webb advanced when Mid-West asserted the right to use the wide dog technology in France, Australia and other countries where Webb similarly held foreign patents on the same technology.  In those later instances, Webb argued that patents held in each nation affirmatively limit a U.S. patent licensee's ability to use the technology in that particular country.[9]  Second, regarding the China project, Webb argues that Mid-West did not need to obtain a China-specific license because Webb does not hold a patent in China.  The flaw in this argument is that Webb should not have

_____

[9] Apparently components can be manufactured in the United States even if final assembly is in a foreign country, regardless of whether that foreign country is Canada, China or France.

-19-

accepted Mid-West's royalty payments if it did not believe that it was necessary for Mid-West to license the technology for a China setup.[10]

Webb does point out that Mid-West intra-office correspondence suggests that Mid-West did not consider the License Agreement applicable to projects outside the United States. For example, after inquiring whether Webb had a patent on the wide dog technology in Australia and learning of Webb's interpretation of the License Agreement, McClellan sent a memo on January 27, 1992, to two Mid-West employees stating that, "It will be necessary for us to use another method of transfer for the" conveyor than the wide dog technology. Terry Cauley, a Mid-West employee, later prepared a memorandum on February 10, 1992, to Mid-West's officer in charge of international marketing, stating, "With what we now know about our agreement w/Webb for Wide Dog transfers, we do not have the right to sell except in Canada & U.S.A."

However, this evidence does not conclusively establishes that Mid-West did not believe it had bargained originally for a worldwide license. The intraoffice correspondence reflects that Mid-West appears first to have questioned what it thought was the worldwide scope of its license only after Webb informed Mid-

---

[10] Webb argues that because the components for the China project "were presumably made in the United States," Mid-West was required to pay the royalty on the China sale. However, Mid-West states that Webb never inquired of Mid-West where the components were being produced before accepting the royalty payments. Furthermore, Webb presented no evidence that the components were produced in the United States.

West that the license applied only to the United States and Canada. Clark testified that at the time the bidding for the Australian project was occurring, Clark had discussed competitive reasons with Webb officers concerning why the License Agreement should be restricted in scope:

> Q. Now, when this dispute arose, you will agree with me, won't you, Mr. Clark, that you did discuss competitive reasons with your people at Webb why the License Agreement should be restricted in scope; isn't that true?
>
> A. In terms of where it could be utilized on international projects, yes, that is true, we talked about that.
>
> Q. And specifically that if Mr. [sic] Mid-West couldn't use the wide dog, it might add to the price if they had to use an alternative method on jobs that both Webb and Mid-West were bidding; isn't that true?
>
> A. That is true.

(R.O.A. B198.) Clark then told Mid-West that it considered the License Agreement applicable only to the United States and Canada. Mid-West's actions in response appear to suggest that they were proceeding cautiously because they were uncertain whether their interpretation or Mid-West's interpretation was correct. However, we do not interpret these actions as necessarily suggesting, as Webb argues, that Mid-West believed at the time the Agreement was entered into that the License Agreement did not apply outside the United States and Canada. In fact, Mid-West states that it decided not to include the wide dog technology in Mid-West's bid for the Australian project only in order to avoid confrontation

-21-

between Mid-West and Webb and because the small project did not require the wide dog technology.

In all, we believe that Webb's acceptance of royalty payments for foreign projects supports the court's conclusion that post-negotiation conduct by the parties indicates they considered the License Agreement applicable worldwide. Although Webb presented some evidence which might suggest that Mid-West believed the license applied only to the United States and Canada, Clark's testimony that he discussed the competitive advantage in limiting the scope of the License Agreement with Webb officials, and the fact that Mid-West's conduct appears to be a reaction to Webb's efforts to limit the Agreement, prevents us from having a "definite and firm conviction that a mistake has been made." See Las Vegas Ice & Cold Storage Co. v. Far West Bank, 893 F.2d 1182, 1185 (10th Cir. 1990).

C.    Webb's other international licenses

The district court also relied on the fact that Webb's foreign licenses define the territorial limitations of each particular license. For example, a license between Webb and an Italian corporation provides that Webb grants a license to sell Webb products "in the Territory." The agreement further defines the "territory" to mean "Italy, Ethiopia, Somalia, Spain, Portugal," and several other listed nations. Based on evidence of numerous licenses with similar language and

-22-

territorial definitions, the court concluded that "Webb knew how to define the geographical territory and limit the license grant to the geographical scope of the defined territory. Webb had done so explicitly in each of the license agreements it had entered into with companies in foreign countries as part of its global licensing program." Mid-West Conveyor Co., Inc. v. Jervis Webb Co., 877 F. Supp. 552, 560 (D. Kan. 1995). Webb responds that its territorial definitions in those licenses were not intended to limit the scope of the particular license agreement to certain nations, but rather to expand it by defining the various nations where the licenses could be used. Webb argues that the lack of any reference to foreign countries in the License Agreement further shows that Webb did not intend to expand the license to any countries outside the United States and Canada.

Although once again this evidence is not conclusive, it does provide some support for the district court's factual conclusion that the parties intended an unlimited geographical scope when they entered into the Agreement in question.[11]

**Conclusion**

---

[11] We also reject two other issues that Webb raises in its briefs, although we have already implicitly rejected these arguments in the above analysis: (1) The district court did not err in denying Webb's motion for summary judgment because the Agreement is ambiguous and the court accordingly needed to decide the parties' intent, which is a question of fact; and (2) We do not consider the Cold Metal opinion controlling in this decision for the reasons stated above.

-23-

The License Agreement is ambiguous because different clauses contained therein could be interpreted to support both Webb's and Mid-West's interpretation of the license's geographic scope. Considering the extrinsic evidence in the record, the district court did not clearly err in concluding that the parties intended to grant Mid-West a worldwide license. We therefore AFFIRM the decision below.