**F I L E D**

**UNITED STATES COURT OF APPEALS**

**AUG 6 1998**

**TENTH CIRCUIT**

AUDIOTEXT COMMUNICATIONS
NETWORK, INC.; CONNECTIONS
U.S.A., INC.,

      Plaintiffs-Counter-Defendants-
      Appellants/Cross-Appellees,

v.

U.S. TELECOM, INC., doing business
as Sprint Telemedia, Inc., formerly
known as Sprint Gateways,
      Defendant-Counter-Claimant-
      Appellee/Cross-Appellant.

Nos. 97-3050, 97-3053
(D.C. Civ. No. 94-2395-GTV)
(D. Kan.)

---

**ORDER AND JUDGMENT***

---

Before **TACHA**, **McWILLIAMS**, and **KELLY**, Circuit Judges.

---

Plaintiffs-Appellants Audiotext Communications Network, Inc. (Audiotext)

and Connections U.S.A., Inc. (Connections) appeal after a jury verdict in their

favor, alleging several errors in both the judgment and in the court's award of

attorney's fees. Defendant-Appellant U.S. Telecom, Inc. (Sprint) cross-appeals

from the judgment against it. Our jurisdiction arises under 28 U.S.C. § 1291, and

---

    * This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. This court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

we affirm as to everything but attorney's fees.

Audiotext and Connections are known, in telecommunications argot, as information providers (IPs). They offer interactive messages and live operators, on a pay-per-call basis, via long distance 900 numbers. Audiotext and Connections offered sports information and psychic, astrological, dating, and pornographic programs. The consumer placing calls is known as the end user. Audiotext and Connections each entered into two consecutive information provider contracts (IP contracts) with Sprint for long-distance pay-per-call service. Sprint, an interexchange carrier (IXC), was obliged under the contracts to carry Plaintiffs' 900 calls over its long distance network, bill and collect charges from the end users, and remit the monies to Plaintiffs. In return, Plaintiffs paid Sprint transport and billing and collection fees. Over the duration of the contracts, Plaintiffs paid Sprint more than $3,000,000 in service fees.

Evidence presented at trial indicated Sprint induced Plaintiffs to enter into the contracts by representing that it could supply 900-number coverage for the whole country, except for insignificant rural pockets where Plaintiffs were not advertising anyway. It became apparent during the course of the contracts, however, that Sprint was not remitting payment to the IPs for a significant volume of calls the IPs serviced. Further evidence showed large areas of unequal access—areas in which AT&T had the ability to bill and collect for 900 calls but

- 2 -

other carriers did not. In these areas Sprint needed to enter into a contract with the local telephone company (LEC) and regional Bell operating company (RBOC) in order to bill to and collect from the end user. When Sprint began offering 900 service in 1989, it had no billing agreements with any LEC or RBOC. During 1990 Sprint entered into billing contracts with only six of the 1200 to 1400 LECs and RBOCs in the United States. Sprint created internal reports and maps of unequal access areas, showing where it did and did not have the ability to bill and collect for 900 calls. Although it could have opened up 900 access to its long distance network only in areas in which it could bill for calls directly or had contracted with a LEC and RBOC for billing services, Sprint deliberately opened 900 access to calls from the entire country.

Connections entered into its first IP contract with Sprint in 1989, and Audiotext followed in 1990. Although its inability to collect and bill for unequal access calls was well-known to Sprint, it failed to inform the IPs of the problem.

When Audiotext and Connections became aware of the substantial disparity between the number of calls they serviced and the number Sprint paid them for, they brought the problem to Sprint's attention. Sprint responded with surprise and assured Audiotext and Connections that the problem was not caused by any deficiency on its part. When the problem persisted and Plaintiffs pursued their complaints, Sprint gave a variety of excuses, transferred Plaintiffs' accounts to

other Sprint representatives, and released misleading reports about the non-equal access issue.

In July 1991, Audiotext installed equipment which allowed it to recognize whether incoming 900 number calls were accompanied by complete billing information, or ANI, which included the end user's name and address. It became immediately apparent Sprint was transporting a significant number of calls unaccompanied by ANI. For each of these calls Sprint collected from Audiotext its transport and billing fees but could not bill the end user, and so could not remit to Audiotext its charge for the call. Audiotext set up its equipment to block calls without complete ANI, and confronted Sprint with the problem. Sprint admitted it was unable to bill in most non-equal access areas. Connections independently discovered the non-equal access problem in September 1991. Sprint withdrew from the 900 number business within the next month.

A jury found Sprint had fraudulently induced and breached its IP contracts with both Audiotext and Connections. The jury awarded compensatory damages on all claims except Connections' fraud claim. After a separate inquiry the jury awarded Audiotext $15,000,000 in punitive damages, but the district court reduced the amount to $2,222,368.20 pursuant to Fla. Stat. Ann. § 768.73 (West 1996). The court refused the jury's request for permission to change its verdict to award Connections compensatory fraud damages, and also denied Plaintiffs'

request for prejudgment interest. The court later granted in part the Plaintiffs' motion for attorney's fees, but awarded only $401,280.00 of the requested $1,618,294.49.

Plaintiffs contend the district court erred in (1) refusing to allow the jury to amend its verdict, (2) reducing the award of punitive damages, (3) denying prejudgment interest under Kansas law, and (4) reducing the award of attorney's fees. In its cross-appeal, Sprint first raises several reasons why the district court erred in denying its motion for judgment as a matter of law on Audiotext's fraud claim. Second, Sprint argues the court erred in failing to limit contract damages as required under the terms of the IP contracts, and, third, erred in failing to enforce an IP contract provision regarding chargebacks. Finally Sprint argues for a new trial on the ground that the inappropriately admitted fraud evidence tainted the contract verdict. The parties agree that in this diversity case Florida law governs the tort claims and Kansas law controls the contract claims. Because Sprint's issues, if they have merit, would be dispositive, we address them first.

We review de novo the denial of judgment as a matter of law. See Taylor v. Cooper Tire and Rubber Co., 130 F.3d 1395, 1399 (10th Cir. 1997). Judgment as a matter of law is appropriate "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1). In

support of its contention that judgment as a matter of law should have been granted against Audiotext's fraud claim, Sprint argues first that the plain language of the IP contracts precludes reliance on its precontractual misrepresentations. Relying on the general rule that representations preceding or accompanying a written contract are merged into the final written contract, Sprint argues its pre-contract misrepresentations as to coverage could not be relied upon in light of this contract language: Sprint "will use its best efforts to maximize coverage for billing and collection by entering into billing and collection agreements with as many LECs as possible." XV Aplt. Exh. App. at 3802; XIX Aplt. Exh. App. at 4591. This clause, according to Sprint, clearly informed Audiotext that Sprint did not have full billing and collection capability, because otherwise there would be no need for Sprint to make further efforts to maximize billing coverage.

A claim of fraud based on oral misrepresentations is barred if a later contract adequately deals with the alleged misrepresentation. See Englezios v. Batmasian, 593 So. 2d 1077, 1078 (Fla. Dist. Ct. App. 1992). Sprint's misrepresentations had to do with "coverage," an ambiguous term that was never clarified in the oral representations or defined in the parties' contract. The misrepresentations obscured Sprint's extensive areas of non-equal access, which were never addressed in the contract. Sprint's contractual promise was to "maximize coverage" by contracting with LECs. Because the contract neither

defined coverage nor addressed non-equal access, it did not adequately deal with the oral misrepresentations, and consequently did not bar the fraud claim based on them.

Sprint also points to the merger and integration clauses in the IP contracts, which provide that the written contracts supersede all prior representations and constitute the parties' whole agreement. It is well settled in Florida that such clauses will not bar evidence of fraud in the inducement of the contract. See Nobles v. Citizens Mortgage Corp., 479 So. 2d 822 (Fla. Dist. Ct. App. 1985).

Sprint's next contention is that there was no evidence Audiotext's first IP contract was fraudulently induced, and that particular claim should not have been submitted to the jury. Although the substantive fraud issues are governed by Florida law, federal law determines whether the evidence is sufficient to submit the case to a jury. See Taylor, 130 F.3d at 1399.

> Judgment as a matter of law is proper only when the evidence and all inferences from it, viewed in the light most favorable to the nonmoving party, is 'so patently in favor of the moving party that a jury verdict in favor of the opposing party would be improper and would have to be set aside by the trial judge.'

Id. (quoting Peterson v. Hager, 724 F.2d 851, 853-54 (10th Cir.1984)). Sprint argues that Mr. Gifford, Audiotext's president at the time of its first IP contract and the officer who executed the contract, did not testify at trial, and consequently no evidence exists that Sprint misrepresented anything to him or

- 7 -

omitted to tell him anything. Sprint's argument turns on its further allegation that Mr. Gifford was the only Audiotext representative involved in the first IP agreement. But here it is mistaken. Sprint's own employee, Diane Thomas Bland, testified it was she who began Sprint's business relationship with Audiotext, and she dealt with Michael Pardes at Audiotext before the first IP agreement. See XI Aplt. App. at 2546-48. She testified she made representations about coverage to Mr. Pardes at that time. See id. The court did not err in submitting this claim to the jury.

Sprint's next argument against Audiotext's fraud claim is that the alleged misrepresentations concern the heart of the parties' agreement in the IP contracts, and consequently Florida's economic loss rule limits Audiotext to its rights under the contracts. The Florida Supreme Court has held that a claim for fraud in the inducement of a contract is an independent tort which is not barred by the economic loss rule, and which may proceed alongside a claim for breach of the contract. See HTP, Ltd. v. Lineas Aeras Costarricenses, S.A., 685 So. 2d 1238, 1240 (Fla. 1996).

> Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely—which normally would constitute grounds for invoking the economic loss doctrine—but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior. . . .

Id. (quoting Huron Tool & Engineering Co. v. Precision Consulting Servs., Inc.,

532 N.W.2d 541, 545 (Mich. Ct. App. 1995). Sprint makes a further distinction: if the substance of the alleged fraudulent misrepresentations is inseparable from what is promised in the contract, an action for fraud is barred and the plaintiff must rely on the promises for which he bargained. See Hotels of Key Largo, Inc. v. RHI Hotels, Inc., 694 So. 2d 74, 78 (Fla. Dist. Ct. App.), review denied, 700 So. 2d 685 (Fla. 1997). Conversely, if the misrepresentations are distinct from the promises in the contract, the fraud claim is not barred by the economic loss rule. See HTP, 685 So. 2d at 1239. In our view this is merely another avenue to arrive at our earlier conclusion: Sprint's fraudulent misrepresentations were not adequately addressed in the contract. Because the fraud is distinct from the substance of the IP contracts, the claim was not barred by the economic loss doctrine. See id. at 1239-40.

Sprint argues Audiotext failed to prove fraud damages that are separate and distinct from its contract damages. We review the district court's decision on whether the damage award was duplicative for clear error, because of the factual nature of the inquiry. See Mason v. Oklahoma Turnpike Auth., 115 F.3d 1442, 1459 (10th Cir. 1997), appeal decided by Mason v. Oklahoma Turnpike Auth., 124 F.3d 217 (10th Cir. 1997). "[I]t is firmly established that damages for fraud may not be recovered when they merely duplicate those sustained as a result of a concomitant breach of contract." National Aircraft Servs., Inc. v. Aeroserv Int'l,

Inc., 544 So. 2d 1063, 1065 (Fla. Dist. Ct. App. 1989). Audiotext's contract damages compensated it for service fees paid to Sprint in return for which Sprint did not perform its obligations. Among these failures was the thirteen percent deviation between the number of billable calls that reached Audiotext's 900 programs and the number of calls Sprint actually billed. Although no unbilled calls reached Audiotext after it began blocking calls without ANI, Audiotext continued to receive a smaller volume of business than it would have had Sprint not misrepresented its billing capacity. Audiotext's fraud damages compensated it for revenue lost because of this smaller volume of calls after blocking. The district court made this distinction and ordered remittitur of fraud damages that duplicated the contract recovery. The remaining fraud damages were properly recovered. See Williams v. Peak Resorts Int'l Inc., 676 So. 2d 513, 516 (Fla. Dist. Ct. App. 1996).

Sprint next complains that the district court improperly held it had a duty to disclose to Audiotext any material fact which Audiotext did not have an equal opportunity to discover. It argues the proper standard is that it need only have disclosed what Audiotext could not have learned through diligent inquiry. Sprint also complains the court did not properly distinguish between active misrepresentation and nondisclosure. That distinction has been severely criticized by the Florida Supreme Court. See Johnson v. Davis, 480 So. 2d 625, 628 (Fla.

1985) ("[W]here failure to disclose a material fact is calculated to induce a false belief, the distinction between concealment and affirmative representations is tenuous. Both proceed from the same motives and are attended with the same consequences; both are violative of the principles of fair dealing and good faith; both are calculated to produce the same result; and, in fact, both essentially have the same effect."). The standard of diligent inquiry Sprint attempts to impose on Audiotext was rejected by the Florida Supreme Court eighteen years ago. See Besett v. Basnett, 389 So. 2d 995, 998 (Fla. 1980) ("We hold that a recipient may rely on the truth of a representation, even though its falsity could have been ascertained had he made an investigation, unless he knows the representation to be false or its falsity is obvious to him."). In Johnson, the court stated Florida law held "that where the parties are dealing at arm's length and facts lie equally open to both parties, with equal opportunity of examination, mere nondisclosure does not constitute a fraudulent concealment." Johnson, 480 So. 2d at 628 (emphasis added). Although the court criticized this rule as not in conformity "with current notions of justice, equity and fair dealing," and in the context of residential real estate transactions imposed a higher duty of disclosure, see id. at 628-29, it follows even from the narrower rule that where the parties do not have equal opportunity to examine, nondisclosure may be fraudulent.

Sprint also quotes Watkins v. NCNB Nat'l Bank, 622 So. 2d 1063, 1065-66

(Fla. Dist. Ct. App. 1993), review denied, 634 So. 2d 629 (Fla. 1994) in support of its nondisclosure standard. However Watkins states, immediately following the passage Sprint quotes, that the plaintiff in that case failed to plead any facts supporting an unequal opportunity to discover. The district court did not err in formulating Florida law.

Sprint next argues several infirmities in the award of contract damages. First, it argues the court failed to limit damages in accord with contractual limitation clauses. Second, it argues that the court improperly reversed itself after trial by holding that certain language in the limitation clauses was ambiguous. Third, it argues the court improperly held that the jury had decided the ambiguous question when the jury had not been instructed to do so.

We review contractual language and the determination of ambiguity de novo. See Mid-West Conveyor Co. v. Jervis B. Webb Co., 92 F.3d 992, 995 (10th Cir. 1996). The IP agreements provided: "IN NO EVENT SHALL [SPRINT] BE LIABLE FOR: (1) ANY INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES INCLUDING, BUT NOT LIMITED TO, ANY DAMAGES RESULTING FROM THE INTERRUPTION OR DISCONTINUANCE OF THE SERVICES FURNISHED BY [SPRINT] . . . OR ANY LOST REVENUES OR PROFITS OF IP. . . ." II Aplt. Exh. App. at 323; XV Aplt. Exh. App. at 3639, 3802; XIX Aplt. Exh. App. at 4592. Sprint argues

Plaintiffs' contract damages were for lost profits or revenues, in violation of its contractual exemption from "consequential damages." Id. We agree with the district court that Plaintiffs' contract damages do not arise from lost profits or revenues. Although Audiotext's fraud damages compensated it for lost revenue, the contract damages for both Plaintiffs arose from service fees Sprint charged them and which, under the contract, were subject to recovery in the event of Sprint's breach.

The contract also provided as follows: "[Sprint's] entire liability resulting from [its] failure to perform any of its obligations under this Agreement shall be IP's actual, direct damages as might be provable in a court of law, but not to exceed the amount paid to [Sprint] for monthly services pursuant to this Agreement." II Aplt. Exh. App. at 323; XV Aplt. Exh. App. at 3639, 3802; XIX Aplt. Exh. App. at 4592. The district court first held the monthly services limitation was an unambiguous contract provision which it would apply as a matter of law. In response to a motion for reconsideration, the court reversed itself and acknowledged there was more than one reasonable interpretation of what amounts were properly included within "monthly services." Because ambiguous contract provisions are questions of fact for the jury, the court held that all parties had had the opportunity to present their interpretations to the jury, and the jury had obviously found Plaintiffs' evidence convincing.

- 13 -

The district court was correct in concluding "monthly services" was ambiguous. See City of Wichita v. Southwestern Bell Tel. Co., 24 F.3d 1282, 1287 (10th Cir. 1994) (applying Kansas law and holding the contract term "gross receipts from noncompetitive services" ambiguous). The two competing reasonable interpretations were that the term included either all monthly charges paid to Sprint, or only flat fees recurring each month. Sprint argues the latter view is the unambiguous plain meaning of the clause because Plaintiffs' interpretation—that the amount includes the total monthly fees paid to Sprint—would render the word "monthly" superfluous. We disagree. Under Plaintiffs' interpretation monthly services are still distinguished from one-time flat fees paid to Sprint to begin service. See II Aplt. Exh. App. at 328.

Sprint argues the court erred in determining after trial that the issue had been decided by the jury even though no instruction was given on the matter. Sprint did not timely object to the court's failure to give an instruction, however, and has thus waived its claim. See Fed. R. Civ. P. 51. Although Sprint suggests it was prejudiced by the court's initial determination that the provision was unambiguous, depriving it of the opportunity to present evidence on the matter, we note that Sprint called an expert in billing charges to testify as to the meaning of the monthly services limitation. We find no plain error. See Unit Drilling Co. v. Enron Oil & Gas Co., 108 F.3d 1186, 1190-91 (10th Cir. 1997).

Sprint's next major argument is that the district court failed to enforce a provision of the IP contracts relating to chargebacks, and thus improperly allowed Plaintiffs damages under this rubric. Chargebacks refer to 900 fees billed to and disputed by the end user, which, as a result of that dispute, are deemed uncollectible. A multitude of reasons could support the determination that a 900 fee was uncollectible; the end user might deny all knowledge of the call, for example, or claim a minor had made the call, or he might simply refuse to pay. The first IP agreements provide that if any single phone number's monthly chargebacks exceeded $20.00, the IP would bear the loss, and where the chargebacks per phone number per month were less, Sprint would bear them. The second IP contracts lowered the threshold to $10.00. Sprint argues the Plaintiffs calculated their damages to include chargebacks that were properly assessed to them under these contract provisions.

Some disagreement, however, existed as to the definition of "chargeback." Plaintiffs point to a Factoring Agreement between Sprint and Audiotext which defines chargeback as "the amount of any IP Account for any Billing Period which is disputed by an end-user <u>and which is determined by [Sprint] to be uncollectible</u>." XIX Aplt. Exh. App. at 4574 (emphasis added). Plaintiffs maintain their chargeback damages were based on those instances in which Sprint failed to "determine" the charges to be "uncollectible." Plaintiffs proved this at

trial through Sprint's witnesses and by offering in evidence the reason code Sprint listed next to each chargeback, along with the reason code tables. The reasons for the chargebacks indicate many of them—although disputed by the end user—were not determined by Sprint to be uncollectible. Plaintiffs' evidence also indicated that callers repeatedly took advantage of their programs, denied all knowledge or refused to pay, and requested an adjustment. See I Aplt. Supp. App. at 72–163, III Aplt. Supp. App. at 675–822. Although Sprint contends that adjustments were granted by LECs, and Sprint was bound by their decisions on billing matters, Sprint's private arrangements with LECs did not bind the Plaintiffs. Plaintiffs' billing agreements were with Sprint, and they were entitled to hold Sprint to its word. Sprint presented its view of chargebacks to the jury, and the jury apparently believed that much of what Sprint failed to collect from end users were not "chargebacks" under the IP agreements, and thus not subject to the chargeback threshold.

Sprint's final argument is that the improper submission of fraud claims tainted the jury's consideration of the contract claims. This argument fails in the wake of our holding that the fraud claims were properly submitted to the jury.

We turn now to the issues raised by Plaintiffs in the main appeal. We review for abuse of discretion Connections' claim that the court erred in refusing to resubmit to the jury the verdict on its compensatory fraud damages. See Unit

- 16 -

Drilling, 108 F.3d at 1192. Although the jury found that Sprint fraudulently induced Connections to enter the IP contracts, it entered zero in the space for Connections' compensatory fraud damages. On the special verdict form immediately following these findings, an interrogatory stated that if the jury had found Sprint defrauded Connections, and if it awarded Connections compensatory fraud damages, then it should decide whether Connections was entitled to punitive damages. Although it had not satisfied both parts of the question's predicate, the jury answered that Connections was entitled to punitive damages. See V Aplt. App. at 957-58. When the jury realized that its finding of no compensatory fraud damages prevented it from awarding punitive damages to Connections, it wrote the court a note:

> it was not our intention to absolve Sprint from punitive damages with regard to Connections' fraud claim against them—we simply could not decipher the fraud amount asked for. The verdict forms for Connections asked for 7 figures—we were able to derive 6 figures from Art Levinson's testimony and Exhibit number 1980. Missing was the figure for damages due to fraud. We all agreed to award the entire amounts asked for plus punitive damages . . . . We were not aware that by leaving the fraud amount at zero Sprint would not have to pay punitive damages to Connections.

XII Aplt. App. at 3049.

Connections argues the special verdict was inconsistent and the court was required to resubmit it to the jury for clarification. See Unit Drilling, 108 F.3d at 1191. In reviewing this claim we must accept any reasonable view of the case

that will conform to the verdict. See Patton v. TIC United Corp., 77 F.3d 1235, 1241 (10th Cir.), cert. denied, 518 U.S. 1005 (1996). We think it clear the jury simply failed to follow the court's instructions in the special interrogatory. According to those instructions the jury's factual finding of zero compensatory fraud damages precludes its determination that punitive damages were appropriate. See Stoddard v. School Dist. No. 1, 590 F.2d 829, 835 (10th Cir. 1979). Where predicate factual findings have been rendered in special interrogatories, an erroneous legal conclusion by the jury may be disregarded. See Ratigan v. New York Central R.R., 291 F.2d 548, 555 (2d Cir.), cert. denied, 368 U.S. 891 (1961). The jury's misperception of the legal effect of its compensatory damages finding provides no basis on which to allow it to alter that factual finding. From the jury's note it is apparent that Connections failed in its burden of persuasion on this issue, and the court was well within its discretion in refusing to send the issue back to the jury. Although Connections argues in its reply brief that under Florida law punitive damages for fraud may be awarded in the absence of compensatory fraud damages, see Ault v. Lohr, 538 So. 2d 454, 456 (Fla. 1989), it did not raise this point in the district court. Because Connections has not complied with Tenth Cir. R. 28.2(b) by demonstrating where in the 13,000-page record it was raised and ruled on, we deem the point waived. See Harolds Stores, Inc. v. Dillard Dep't Stores, Inc., 82 F.3d 1533, 1540 n.3

- 18 -

(10th Cir.), cert. denied, 117 S. Ct. 297 (1996).

We review de novo Audiotext's claim that the district court misinterpreted Fla. Stat. Ann. § 768.73 by applying it to Audiotext's award of punitive damages. See City of Wichita v. United States Gypsum Co., 72 F.3d 1491, 1495 (10th Cir. 1996). The statute provides:

> (1) (a)  In any civil action based on negligence, strict liability, products liability, misconduct in commercial transactions, professional liability, or breach of warranty, and involving willful, wanton, or gross misconduct, the judgment for the total amount of punitive damages awarded to a claimant may not exceed three times the amount of compensatory damages awarded to each person entitled thereto by the trier of fact, except as provided in paragraph (b).
> (b)  If any award for punitive damages exceeds the limitation specified in paragraph (a), the award is presumed to be excessive and the defendant is entitled to remittitur of the amount in excess of the limitation unless the claimant demonstrates to the court by clear and convincing evidence that the award is not excessive in light of the facts and circumstances which were presented to the trier of fact.

Fla. Stat. Ann. § 768.73(1)(b) (West 1996). Audiotext raises four arguments on this claim. First, it argues its fraudulent inducement claim does not constitute "misconduct in commercial transactions," id., and thus the statute does not apply to its punitive damage award. Second, it argues that even if the statute does apply, the district court erred in trebling only Audiotext's compensatory fraud damages instead of its total compensatory damages in arriving at the statutory cap. Third, it argues the district court erred in finding it had not rebutted by clear and convincing evidence the presumption of excessiveness under § 768.73(1)(b).

- 19 -

Fourth, it contends that even if the court did not commit a legal error in applying the statute, it abused its discretion in denying Audiotext's motion to alter or amend the judgment by removing the punitive damages cap.

The statute does not define "misconduct in commercial transactions" and Florida courts have not addressed the issue presented to us, but we think the statute's plain meaning covers Sprint's fraud in its commercial relationship with Audiotext. The Florida Supreme Court has held that a legitimate objective of § 768.73 is to "discourage punitive damage claims." Gordon v. State, 608 So. 2d 800, 802 (Fla. 1992), cert. denied, 507 U.S. 1005 (1993). It has also held that "misconduct in commercial transactions" covers intentional torts, in particular the tort of malicious prosecution. See Alamo Rent-A-Car, Inc. v. Mancusi, 632 So. 2d 1352, 1357-58 (Fla. 1994). In Mancusi, the plaintiff thought he had rented a car from Alamo for one month; however the rental contract indicated a rental period of one week. Sometime after the week had elapsed, Alamo had Mancusi arrested and prosecuted. Mancusi sued Alamo for malicious prosecution, won compensatory and punitive damage awards, and the Florida Supreme Court held that "misconduct in commercial transactions" covered the punitive award. See id. at 1354-58.[1] We believe this indicates a flexible and common-sense reading of

_____

[1] Although Audiotext asserts Mancusi's holding on this point is dictum because the court ultimately held the statute did not apply retroactively to Mancusi's cause of action, we believe it still provides an authoritative indication

the misconduct phrase. Audiotext argues that because the phrase says "misconduct <u>in</u> a commercial transaction," it does not apply to its misconduct <u>before</u> the IP agreements. While this textual argument has appeal, we do not think the Florida courts would read the statute in such a technical fashion. The entire relationship between Sprint and Audiotext was commercial, and we believe their pre-contract negotiations fall within the ordinary meaning of "commercial transaction." In <u>Mancusi</u>, the Court held that an intentional tort which occurred after the expiration of the one-week rental contract was "during the course of the commercial transaction" and was "the direct result of that commercial transaction." <u>Id.</u> at 1357. Similar logic brings commercial contract negotiations within the scope of the statutory phrase. But Audiotext's technical argument is perhaps better met with another: an element of fraudulent inducement is damages, <u>see</u> <u>Baker v. United Servs. Auto. Ass'n</u>, 661 So. 2d 128, 131 (Fla. Dist. Ct. App. 1995), <u>review denied</u>, 669 So. 2d 252 (Fla. 1996) and damages did not begin to accrue until the IP contracts were executed. Therefore part of Sprint's misconduct occurred "in" the commercial transactions. Audiotext also relies on <u>Scheidt v. Klein</u>, 956 F.2d 963, 970 (10th Cir. 1992), in which we included the dictum "common law fraud does not appear to fall within the explicitly delimited scope of section 768.73(1) . . . ." <u>Id.</u> <u>Scheidt</u> was decided prior to <u>Mancusi</u>, and

_____

of how Florida courts would interpret the statute.

- 21 -

the quoted statement was not necessary to our decision because we held the argument to which it applied had been waived.  See id.

Audiotext argues next that the district court erred in trebling only its compensatory fraud damages and excluding contract damages when calculating the punitive damage cap.  Audiotext relies on the language of the statute and Christenson & Assocs. v. Palumbo-Tucker, 656 So. 2d 266 (Fla. Dist. Ct. App. 1995) for its contention that the total compensatory damage award for all claims should have been trebled to calculate the cap.  The relevant statutory language states: "the total amount of punitive damages awarded to a claimant may not exceed three times the amount of compensatory damages awarded to each person . . . ." Fla. Stat. Ann. § 768.73(1)(a).  Christenson held that prejudgment interest should be included in the compensatory damage award before trebling.  See Christenson, 656 So. 2d at 266 ("Certainly, there is nothing in section 768.73 authorizing judges to separate the various elements composing the bundle of compensatory damages and discard from the punitive damages formula those elements that the judge personally deems unwise.").  Although Christenson's language is broad, it does not support Audiotext's reading.  Section 768.73 appears under the statutory chapter "Torts," and we believe it must be read in that context.  Under Audiotext's interpretation, unrelated claims compensated in one lawsuit would all be trebled so long as punitive damages were awarded on one of

the claims. Further, Audiotext's interpretation would violate Florida's rule that punitive damages may not be recovered for breach of contract. See Lewis v. Guthartz, 428 So. 2d 222, 223 (Fla. 1982). Punitive damages are recoverable for the independent tort of fraud, and it is to that claim the statute refers.

Audiotext next complains that the district court erred in finding it had not met its statutory burden of demonstrating to the court by clear and convincing evidence that the punitive damage award was not excessive. We review the court's finding for clear error. See FDIC v. Hamilton, 122 F.3d 854, 860 (10th Cir. 1997). Further, we owe deference to the district court's opportunity to judge the credibility and weight of evidence, see Salve Regina College v. Russell, 499 U.S. 225, 233 (1991), and we may not substitute our judgment for that of the trial court, see Anderson v. City of Bessemer City, 470 U.S. 564, 574 (1985). We have reviewed the record and cannot say the court clearly erred in finding Audiotext did not meet its high burden.[2] Moreover, having reviewed de novo the district court's interpretation of Fla. Stat. Ann. § 768.73, we see no reason to traverse the same ground using the more deferential abuse of discretion standard

---

[2] In its effort to convince us the punitive damage award was not excessive, Audiotext cites more than once to Continental Trend Resources, Inc. v. OXY USA Inc., 44 F.3d 1465 (10th Cir. 1995). That decision was vacated and remanded by the Supreme Court. See OXY USA Inc. v. Continental Trend Resources, Inc., 517 U.S. 1216 (1996), on remand, Continental Trend Resources, Inc. v. OXY USA Inc., 101 F.3d 634 (10th Cir. 1996) (reducing punitive damages from $30,000,000 to $6,000,000), cert. denied, 117 S. Ct. 1846 (1997).

under which Audiotext complains about the denial of its motion to alter or amend the judgment.

Both Audiotext and Connections contend the district court erred in denying them prejudgment interest on their contract damages under Kansas law. We review the denial of prejudgment interest for abuse of discretion, see Frymire v. Ampex Corp., 61 F.3d 757, 772 (10th Cir. 1995), cert. dismissed, 519 U.S. 1182 (1996), but consider the underlying question of statutory interpretation de novo, see Driver Music Cos. v. Commercial Union Ins. Co., 94 F.3d 1428, 1433 (10th Cir. 1996). Kan. Stat. Ann. § 16-201 (West 1996) provides:

> Creditors shall be allowed to receive interest . . . for any money after it becomes due; for money lent or money due on settlement of account, from the day of liquidating the account and ascertaining the balance; . . . for money due and withheld by an unreasonable and vexatious delay of payment or settlement of accounts . . . .

Id. Plaintiffs argue they are entitled to prejudgment interest on both statutory grounds: first, that the contract damages due them were liquidated; second, that Sprint unreasonably and vexatiously withheld payments which were due and owing to Plaintiffs.

"A claim becomes liquidated when both the amount due and the date on which it is due are fixed and certain, or when the same become definitely ascertainable by mathematical computation." Plains Resources, Inc. v. Gable, 682 P.2d 653, 657 (Kan. 1984). Disputes as to underlying liability are irrelevant

- 24 -

provided the amount of damages is certain.  See Royal College Shop, Inc. v. Northern Ins. Co., 895 F.2d 670, 674 (10th Cir. 1990).  The amount of damages was the subject of extensive trial testimony and involved complex statistical procedures and aggregations, some of which were hotly disputed.  Audiotext's own representative testified as to how he had arrived at the 73% damage figure for excessive chargebacks: "Yeah.  What I felt was reasonable is what came out to about 73—."  I Aplee. App. at 133.  We think it obvious the damages were not liquidated.

The trial court has discretionary power to award interest as an element of damages even if the primary damages are not liquidated.  See Lightcap v. Mobil Oil Corp., 562 P.2d 1, 16 (Kan.), cert. denied, 439 U.S. 876 (1977).  Guided by considerations of fairness and equity, such an award is intended to fully compensate a party injured through vexatious withholding of monies owed.  See id. at 16.  The award is dependent, of course, on the trial court's discretion, to which we defer because it had the opportunity to scrutinize the evidence, assess credibility and probativeness, and balance the equities.  See Royal College Shop, 895 F.2d at 675–76.  We find no abuse of that discretion.

Plaintiffs finally argue the district court abused its discretion in awarding them a substantially reduced amount of attorney's fees.  The IP agreements provided that "[i]n the event of legal action by either of the parties hereto," the

party in whose favor final judgment is entered is entitled to attorney fees, costs, and expenses from the losing party. See, e.g., XIX Aplt. Exh. App. at 4596. Plaintiffs' counsel requested compensation for 7,160 hours at an average rate of $236.75, for a total of $1,618,294.49, plus $332,865.55 in expenses. The district court awarded $350,000 in fees and $51,280 in expenses. Plaintiffs protest the court's decision to award fees only for claims on which they succeeded, its failure to fully explain its reductions to the fee award, its failure to consider the degree of success they achieved, and its decision to "simply make a general reduction" instead of cutting particularized hours based on specific findings. VIII Aplt. App. at 2031.

When a court awards attorney fees pursuant to a contract, as opposed to a statute, we have recognized that its duty is to ensure the nonbreaching party is made whole and receives the benefit of its bargain. See United States ex rel. C.J.C., Inc. v. Western States Mechanical Contractors, Inc., 834 F.2d 1533, 1547-48 (10th Cir. 1987). Because these purposes are fundamentally different from those underlying statutory fee awards, we have held that the close scrutiny applied to statutory fee awards should not be applied to contractual awards, see id.; Public Serv. Co. of Colo. v. Continental Cas. Co., 26 F.3d 1508, 1520 & n.11 (10th Cir. 1994), which should be routinely awarded. See Public Serv. Co. of Colo., 26 F.3d at 1520-21. The trial court's task is not to fix a reasonable fee, as it is in

statutory awards, but only to determine whether the requested fee is "inequitable or unreasonable," in which case it may reduce the fee accordingly. See C.J.C., Inc., 834 F.2d at 1549. Kansas law governs the contractual award of fees. See Public Serv. Co. of Colo., 26 F.3d at 1520.

The district court properly stated Kansas standards for determining the reasonableness of the fee, and we cannot find that it abused its discretion in fixing a rate or in separating reasonable from unreasonable categories of fees. Nor did the court abuse its discretion in declining to give great weight to the plaintiffs' degree of success. See C.J.C., Inc., 834 F.2d at 1547-50 (holding court is not bound to consider federal statutory fee factors). However the court refused to subtract the categories of unreasonable billings from the total in order to arrive at a reasonable fee. Instead it simply picked a figure it thought reasonable. We consider such a general reduction an abuse of discretion. The court must articulate some rational method by which it arrives at a reasonable fee. See C.J.C., Inc., 834 F.2d at 1550 (holding that in contractual fee award "it remains important for the district court to provide a 'concise but clear explanation' of its reasons for any adjustments to the fee award.") (quoting Mares v. Credit Bureau of Raton, 801 F.2d 1197, 1201 (10th Cir.1986) (quoting Hensley v. Eckerhart, 461 U.S. 424, 437 (1983))).

Although the court stated that Plaintiffs had not totaled their billings for

each separate claim, and refused to "scour through nearly 500 pages of unindexed billing statements," VIII Aplt. App. at 2030, we know of nothing requiring Plaintiffs to index or segregate their charges for various claims. We have held that contractual fee claimants need not meticulously describe each task billed. See Public Serv. Co. of Colo., 26 F.3d at 1520 ("While the absence of specific task descriptions may preclude an award of fees in cases arising under a federal fee-shifting statute . . . the same degree of specificity is not required in the context of contractual fee awards."). Cf. id. at 1521 (holding court need not comb voluminous billing records to ferret out certain hours which opposing party complained about but failed to draw to the court's attention). If the court wishes to cut time spent on claims which were not ultimately successful, it should do so and recalculate the fee to arrive at a reasonable figure. See id. (affirming trial court's use of lodestar approach and specific deduction of unreasonable billings).

AFFIRMED in part, REVERSED in part, and REMANDED.

Entered for the Court

Paul J. Kelly, Jr.
Circuit Judge