FIRST NATIONAL BANK OF LANDER, a National Banking Association and a Subsidiary of Wyoming Bancorporation, and Wyoming Bancorporation, a Wyoming Bank Holding Company, Appellants (Defendants below),

v.

FIRST WYOMING SAVINGS AND LOAN ASSOCIATION, a Wyoming Guaranty Capital Savings and Loan Association, Appellee (Plaintiff below).

No. 4983.

Supreme Court of Wyoming.

March 27, 1979.

Stanley K. Hathaway, Jack B. Speight, and Blair J. Trautwein, of Hathaway, Speight & Kunz, Cheyenne, for appellants.

John T. Pappas, of Vidakovich, Pappas & Hooper, P. C., Lander, for appellee.

Before RAPER, C. J., McCLINTOCK, THOMAS and ROSE, JJ., and GUTHRIE, J., Retired.*

ROSE, Justice.

This case represents the second chapter in the controversy surrounding a name-change initiated by the Wyoming Bancorporation with respect to its seventeen member banks. See, *Wyoming National Bank of Casper v. Security Bank & Trust Co.*, Wyo., 572 P.2d 1120 (1977). We are concerned here with the name-change sought by the Wyoming Bancorporation's subsidiary in Lander, Wyoming—The First National Bank of Lander. First National, like the other subsidiary banks, planned to change its name to "First Wyoming Bank, N.A.—Lander." On December 9, 1976, the appellee-plaintiff, First Wyoming Savings and Loan Association, filed a complaint seeking to permanently enjoin the defendants from making the name-change in Lander or elsewhere in Wyoming. The basis of the complaint against First National Bank was that First Wyoming Savings had established a trade name in the words "First Wyoming" and that the use of the name "First Wyoming Bank—Lander" would result in confusion and deception to the general public in Fremont County. First Wyoming Savings' complaint against the Wyoming Bancorporation was similarly based, with the addition of the allegations that First Wyoming Savings was empowered by state and feder-

al law to establish branch institutions throughout Wyoming and that the use of the name "First Wyoming Bank" would effectively preclude it from branching without confusion and deception. Both complaints were, in part, premised on the alleged protection provided by the First Wyoming Savings' registration of its service mark pursuant to the Wyoming statutes. The district court granted permanent injunctive relief, enjoining the use by the First National Bank of the name "First Wyoming Bank—Lander" in Fremont County, and enjoining the Wyoming Bancorporation from using the name "First Wyoming Bank" at any place in Wyoming. We will affirm the injunctive relief against First National Bank, but reverse the judgment against the Wyoming Bancorporation.

On January 7, 1975, plaintiff opened its business in Lander. On February 20, 1975, plaintiff registered, as a service mark, its progressive antelope-design logo with the Secretary of State. Pursuant to information received in regard to the defendants' proposed name-change, the plaintiff protested the name-change in a letter, dated November 19, 1975, to the Federal Comptroller of the Currency. On November 20, 1975, plaintiff filed another service-mark application with the Secretary of State, indicating a desire to register the name "First Wyoming Savings," together with the previously registered logo. Pursuant to this application the two were consolidated into a single service mark. In a letter dated December 12, 1975, plaintiff was informed that the Comptroller of Currency had approved the name-change for the First National Bank to "First Wyoming Bank, N.A.—Lander." On December 12, 1975, plaintiff had a meeting with the State Examiner over the possibility of filing a branch application. On December 19, 1975, the plaintiff's Board of Directors was informed that the preliminary feeling of the Secretary of State's office was that there would be no

---

* At the time of oral argument, Guthrie, J., was Chief Justice. He retired from the court on December 31, 1978. By order of the court, entered January 1, 1979, he has been retained in active judicial service pursuant to Article 5, Section 5, Wyoming Constitution, and Section 5-1-106(f), W.S.1977, and has continued to participate in the decision and opinion of the court in this case.

confusion arising from the defendants' name-change.

In a letter dated January 5, 1976, plaintiff requested the defendants to refrain from using the name "First Wyoming" for any of the member banks and particularly for the Lander bank. At a board meeting on May 13, 1976, the plaintiff's attorney informed the Board that the Bancorporation had prevailed at the district court level in the litigation culminating in our Wyoming National Bank decision, and that there would probably be an appeal. On November 4, 1976, plaintiff mailed a letter to the First National Bank, indicating that the plaintiff had been advised that First National Bank might be taking steps to effect the proposed name-change, that the plaintiff intended to institute legal action, and that the defendant should mitigate its damages. On November 10, 1976, defendants' attorney responded that they had already spent over $130,000 on the name-change, that the name-change had been approved by state and federal authorities, and that it would be impossible to mitigate damages. Defendants proceeded, on December 1, 1976, to register its service mark —"First Wyoming Bank—(name of city)"— with the Secretary of State. On December 8, 1976, First National Bank publicly announced its name-change. The following day this litigation was commenced.

We summarize the issues in this case as follows:

1. Whether federal statutes regulating national banks preclude state court jurisdiction over this action;

2. Whether the trial court erred in finding that the defense of laches had not been established;

3. Whether injunctive relief against the use of the name "First Wyoming Bank" in Fremont County is supported by the law and the facts; and

4. Whether statewide injunctive relief can be granted on the basis of a prior registration under the service-mark statutes.

## FEDERAL PREEMPTION

Defendants suggest that a state court has no jurisdiction to overturn federal approval of name-changes of nationally chartered banks. Plaintiff responds that, notwithstanding federal regulation of national banks, state courts retain authority to protect against an unlawful or tortious use of a name.

■ The general rule is that a national bank can adopt any name approved by the Federal Comptroller of Currency; and it cannot be interfered with by any other authority, except where its use constitutes a tortious infringement on the name of another existing bank. 9 C.J.S. Banks and Banking § 561 (1938). Generally, administrative rulings on whether the name of a proposed corporation is so similar to that of an existing corporation as to be calculated to deceive are not conclusive as to the right to use the name. Annot., "Protection of business or trading corporation against use of same or similar name by another corporation," 66 A.L.R. 948, 1015 (1930).

Defendants rely on the more recent authority contained in the decision in *Traverse City State Bank v. Empire National Bank*, 228 F.Supp. 984 (D.Mich.1964), to overturn these general rules. In the *Traverse City State Bank* case, the defendant bank—at a time when it was a state banking corporation—applied for and received permission from state authorities to establish a branch office in the location where it desired to move its principal office. The plaintiff bank sought judicial review of this decision, resulting in a state court decision overruling the establishment of this branch office. Subsequently, the defendant bank received approval by the Federal Comptroller of the Currency to convert to a national banking association and to change the location of its main office. Plaintiff bank again instituted a suit, claiming that the change in location was foreclosed by the prior state court decision. The federal district court held that, in the absence of express permission provided in the federal statutes, a state court decision interpreting a state statute regulating a state banking association can-

not control the federal statutory discretion given to the Comptroller of Currency in his administration and regulation of national banking associations.

The obvious difference between the *Traverse City State Bank* case and the case now before us is that here we are concerned with an alleged tortious use of a name. We could find no federal cases holding that the approval of a name by the Federal Comptroller of Currency preempts consideration of the propriety of the use of that name by a state court. This question was raised in passing in *State of North Dakota v. Merchants National Bank and Trust Company*, 8 Cir., 579 F.2d 1112 (1978), but the court declined to decide the issue. In doing so, the court mentioned that dicta in the *Traverse City State Bank* case supported a denial of jurisdiction, but that the actual issues in that case differed significantly from the name-change problem.

Our research discloses that the only case that squarely decides the question before us holds that a state court has jurisdiction to consider the tortious or unlawful use of a name by a nationally chartered bank, even though that name has been approved by the Federal Comptroller of Currency. *Middleton Trust Co. v. Middleton National Bank*, 110 Conn. 13, 147 A. 22 (1929). We find the logic of this decision convincing. The Connecticut Supreme Court of Errors stated, in pertinent part:

"The Federal statutes and decisions have rendered futile any attempt by a state to define the duties of national banks or control the conduct of their affairs whenever such attempted exercise of authority expressly conflicts with the laws of the United States and either frustrates the purpose of the national legislation or impairs the efficiency of these agencies to discharge the duties for the performance of which they were created [Citations omitted]. Nevertheless, national banks remain subject to such state regulation and control as is not discriminatory in favor of local institutions which are, in a sense, in competition with them, and which does not interfere with the purpose of their creation, tend to impair or destroy their efficiency as Federal agencies, or conflict with the paramount laws of the United States affecting such banks. [Citations omitted]

"Attempts on the part of the state, by Legislation, administrative action, or judicial decision, to deprive national banks of trust or other powers such as are exercised by state institutions, which have been involved in most of the decided cases, . . . present a real conflict of authority, and the right conferred by the Federal laws must prevail. There is an obvious distinction, however, between such cases and the application of principles such as those protecting against unfair competition, to which all corporations, of whatever nature and wherever and by what authority incorporated, are amenable. The considerations which we have quoted as to the unlawful or tortious utilization of names adopted under state charters or incorporation statutes seem in no respect inapplicable to corporations chartered by or under the Federal government, and we find nothing, in law or reason, to emancipate a national bank from a just submission to and observance of such common and universal limitations upon the employment of a name. . ." 147 A. at 24–25.

Expanding on these observations, it has been suggested that the Federal Comptroller of Currency may not have jurisdiction to consider an issue of state common-law trade-name infringement—even though the standards utilized are similar. See, *State of North Dakota v. Merchants National Bank and Trust Company*, supra, at 1114.

■ We hold that the decision of the Federal Comptroller of Currency, approving the defendants' name-change proposal, in no way preempted the district court's consideration of the plaintiff's claim of infringement.

## LACHES

Defendants claim that, because of plaintiff's one-year delay in bringing the infringement suit, coupled with what the de-

fendants claim as prejudice, it would be inequitable to grant injunctive relief. Plaintiff responds that the defendants had sufficient notice of the plaintiff's adverse claim and that the defendants proceeded at their own peril. In addition, plaintiff asserts that it was not sure that the defendants were actually going to effectuate the name-change—due to other pending litigation pertaining to the change—until shortly before the suit was instituted.

■ It has been succinctly stated that to invoke laches against the plaintiff in an infringement action, he must be chargeable with *inexcusable* delay which *prejudiced* the *innocent* defendant. 4 Callmann, Unfair Competition, Trademarks and Monopolies (3rd Ed.), § 87.3(b), p. 127 (1970), citing *Standard Oil Co. of Colorado v. Standard Oil Co.*, 10 Cir., 72 F.2d 524, 527, cert. den. 293 U.S. 620, 55 S.Ct. 216, 79 L.Ed. 708 (1934). See, *Torgeson v. Connelly*, Wyo., 348 P.2d 63, 69 (1959); and *Beadle v. Daniels*, Wyo., 362 P.2d 128, 131 (1961) and cases cited therein. If any one of these elements is absent, the defense of laches must fail.

■ In disposing of this issue, we choose to focus on the excusability of the plaintiff's delay in instituting suit. We do so with the realization that the laches defense is reserved for those rare cases where a protracted acquiescence by plaintiff induces a defendant to undertake substantial activities in reliance on the acquiescence. *McNeil Laboratories, Inc. v. American Home Products Corporation*, 416 F.Supp. 804, 809 (D.N. J.1976).

In this case, the plaintiff requested the defendants to refrain from implementing the name-change on January 5, 1976, but did not renew this protest until November 4, 1976. Plaintiff was aware of the proposed name-change as early as November, 1975. During May, 1976, plaintiff's Board of Directors was aware that the Bancorporation had prevailed at the trial level in the Casper litigation, but they took no legal action because "we had a concern over the cost of such an action, and secondly, we were awaiting the outcome of that trial in

Casper." The question, then, is whether a concern for the costs of litigation and a wait-and-see attitude regarding related litigation is a justifiable excuse for delaying legal action. If so, we need not consider the good faith of the defendants or the prejudice suffered.

■ In most instances, a plaintiff can give a prompt warning even though he delays filing suit—a certain degree of reluctance to undertake the time and expense of lawsuit, unless absolutely forced to do so, is both understandable and excusable. 4 Callmann, supra, § 87.3(b)(1), p. 134. This is particularly true when the plaintiff is aware of proceedings between other parties that might obviate the necessity of his litigation. 4 Callmann, supra, § 87.3(b)(1), 1978 Cum.Supp., p. 32, citing *Alfred Dunhill of London, Inc. v. Kasser Distillers Products Corp.*, 350 F.Supp. 1341 (D.Pa.1972). Although the *Alfred Dunhill* decision may be distinguishable in several respects, it does provide an applicable principle of law to justify the trial court's decision on the laches issue. We hold that the plaintiff presented a sufficient excuse, for its delay in instituting formal legal action, to justify the trial court's rejection of the defense of laches.

### INJUNCTIVE RELIEF—FREMONT COUNTY

The defendants contend that the trial court's finding—that the words "First Wyoming" had taken on a secondary meaning and had been appropriated by plaintiff as a common-law trade name in Fremont County—is not supported by the law and the evidence. In addition, they urge that this court should more stringently review the decision in this case, based on an allegation that the trial court adopted, without change, findings prepared by the plaintiff.

■ Speaking first to the degree of inquiry called for in this case, we note that findings and conclusions prepared by counsel and adopted, more or less verbatim, by the trial court may be less helpful on review than findings and conclusions drawn by a

disinterested person. See, *Edward ·B. Marks Music Corp. v. Colorado Magnetics, Inc.*, 10 Cir., 497 F.2d 285, 287 (1974). Nevertheless, findings rendered under such circumstances will stand if supported by the evidence. *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964). In appropriate cases, the circumstances may lead to a more·searching inquiry for error, *In re Las Colinas, Inc.*, 1 Cir., 426 F.2d 1005, 1010 (1970), but the record in this case discloses that the trial court gave the parties a great deal of preliminary guidance in drafting proposed findings and conclusions. Under these circumstances, we see no reason to vary our usual mode of inquiry.

 As stated in *Wyoming National Bank v. Security Bank & Trust Co.*, supra, at 1124, questions regarding trade-name infringement are largely factual determinations to be made by the trier-of-fact and, therefore, we will not disturb a trial court's findings thereon unless they are clearly erroneous or contrary to the great weight of the evidence. We also set forth the applicable standard of law as follows:

"... Unless a trade name is confusing and deceptive on its face, those seeking such protection must take the burden of proving that they have given to their trade names a *secondary meaning* through years of usage and if in this case defendant was to be allowed to use its new name, the *public would be confused by its similarity* to the trade names of plaintiffs. This confusion, in turn, must be such as to warrant issuance of an injunction. That is, potential customers must be confused or deceived into patronizing one bank in the mistaken belief that they are dealing with another bank. ..." [Emphasis supplied] 572 P.2d, at 1121–1122.

A secondary meaning is supplied to geographic or generic words—like those at issue here—when by the process of association the words become distinctive and distinguish the producer of a particular service and the name of that producer. 572 P.2d, at 1124. With regard to the likelihood of confusion, the consumer bears some responsibility for using reasonable care. 572 P.2d, at 1126.

A review of the record discloses that, in Fremont County, questions of fact were present with respect to the likelihood of confusion and the acquisition of a secondary meaning by plaintiff in the words "First Wyoming." The plaintiff presented evidence of one of its signs located in Lander on which the words "First Wyoming" were predominant. It presented various radio announcements—covering the period from March 1975 to August 1976—in which the words "First Wyoming" were emphasized. Five witnesses testified that they commonly referred to plaintiff as "First Wyoming." Finally, a portion of a study—entitled "The Effect of a Proposed Name Change in Lander, Wyoming"—prepared for the plaintiff, was admitted into evidence. The study concludes that "the proposed name change would likely create an awkward and confusing situation in Lander." The study contains data which, if believed by the trial court, would support the trial court's findings. We noted in the *Wyoming National Bank* decision that the technical adequacy of a survey is a matter of the weight to be attached to it and that its validity may be rebutted. 572 P.2d, at 1126. Apparently in this case the trial court was satisfied with the survey's validity, and we are in no position to say otherwise.

 We hold that. the trial court did not clearly err in finding that the defendants' proposed name-change would infringe upon the secondary meaning acquired by plaintiff in the words "First Wyoming" and that injunctive relief in Fremont County was necessary to avoid confusion and deception.

### INJUNCTIVE RELIEF—STATEWIDE

The trial court's entry of injunctive relief against the defendants' use of the words "First Wyoming" throughout the state of Wyoming was premised on the purported exclusive right accorded plaintiff by reason of its service-mark registration under the statutes. The trial court also indicated that it would provide plaintiff with statewide

protection based on the common law and plaintiff's reasonable expectation of expansion statewide.

█ The last-mentioned proposition is clearly erroneous. We indicated in *Wyoming National Bank* that if a secondary meaning is established the person using the trade name is entitled to protection against use by another *in the territory in which the name is understood in a secondary sense.* 572 P.2d, at 1124. See, *Bernstein v. Friedman*, 62 Wyo. 16, 160 P.2d 227, 229 (1945). It is clear that the plaintiff had not used its name outside Fremont County—it merely has the potential to do so. Since the acquisition of a secondary meaning is based on use, the plaintiff in this case did not establish a secondary meaning outside its service area (Fremont County) and, therefore, was not entitled to injunctive relief on a statewide basis by virtue of the common law. See, gen., Annot., "Unfair Competition: Geographical Extent of Protection of Word or Symbol Under Doctrine of Secondary Meaning," 41 A.L.R.3d 434, 442 (1972).

█ This brings us to the effect of the state statutes providing for the registration of trademarks and service marks (§§ 40–1–101 to 40–1–114, W.S.1977). The real question can be narrowed to whether the statute expressly or implicitly discloses a legislative intent to provide a prior registrant with substantive rights greater than those provided at common law. Can a person acquire a preemptive right to use a service mark throughout the entire state by reason of a prior registration, without regard to prior usage sufficient to establish a secondary meaning at common law? The plaintiff contends that an affirmative answer is the only way to provide meaning to the statutory provisions, while the defendants contend that, at most, the statutes are aimed at systematizing, recording, and providing some protection of trademarks acquired by usage. We agree with the defendants.

The Supreme Court of Florida addressed this same question in *Abner's Beef House Corporation v. Abner's International, Inc.*, Fla., 227 So.2d 865 (1969), and held that a statute virtually identical to the Wyoming statute was not intended to vest by mere registration the exclusive ownership of a trade name or trademark in the state, absent the supporting factor of common-law usage, "and especially so where prior rights of others have accrued in the mark, or which are in the process of being bona fide acquired, under the common law." 227 So.2d at 869. See, 4 Callmann, supra, § 97.4, pp. 617–619; and 2 McCarthy, Trademarks and Unfair Competition, § 22:1, pp. 17–18 (1973).

The analysis contained in the *Abner's Beef* decision is helpful in determining the purpose and effect of our own trademark and service-mark statutes. Section 40–1–113, W.S.1977, expressly provides that the act shall not adversely affect rights or enforcement of rights in marks acquired in good faith at any time at common law. Section 40–1–111, W.S.1977, providing for civil liability of an infringer of a registered mark, is made subject to the common-law rights preserved in § 40–1–113, supra. In Florida, a certificate of registration is admissible into evidence as proof of registration *and* as prima facie evidence of the validity of the registration of the registrant's ownership of the mark, and of his exclusive right to the mark in the state. At the time the plaintiff's mark was registered in this case, the statutes provided merely that the certificate of registration was competent and sufficient proof of the registration. § 40–7.4(b), W.S.1957, 1975 Cum. Supp. In 1977, even this provision was deleted. See, § 40–1–104, W.S.1977. In *Abner's Beef*, the court indicated that the registration provided, at most, prima facie validity to a registrant's claimed exclusive ownership of a service mark—with that prima facie ownership being subject to rights of others accruing under the common law. Given the lack of similar language in the Wyoming statute, it is doubtful whether the legislature intended registration to be prima facie evidence of ownership, or to create a preemptive right of ownership statewide without regard of usage.

We have reviewed the cases cited by plaintiff, that reach a different result, but

we find that the statutes in question in some of those cases more clearly grant a statewide right to the exclusive use of a mark. See, *ABC Stores, Inc. v. T. S. Richey & Co.*, Tex.Com.App., 280 S.W. 177 (1926); and *Socony-Vacuum Oil Co. v. Oil City Refiners*, 6 Cir., 136 F.2d 470 (1943). Other cases are premised on the *absence* of territorial limitation in the statutes as evidencing an intent to provide protection on a statewide basis. See, *Kirk v. Big Apple Supermarket of Cleveland*, 42 Tenn.App. 502, 304 S.W.2d 511 (1957); and *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 426, 36 S.Ct. 357, 60 L.Ed. 713 (1916) (Holmes, J., concurring). To the extent that these last-mentioned cases are indistinguishable, we find them unpersuasive.

We hold that the trial court clearly erred in granting plaintiff injunctive relief on a statewide basis.

The trial court judgment is affirmed in part, reversed in part, and the case is remanded for the entry of a judgment consistent with this opinion.