**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 18 2000**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

MILE HIGH INDUSTRIES,

    Plaintiff - Counter-Defendant - Appellant,

v.

ROBERT L. COHEN,

    Defendant - Counter-Claimant - Appellee.

No. 99-8008

---

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 93-CV-85-J)**

---

Walter Urbigkit of Frontier Law Center, Cheyenne, Wyoming, for Plaintiff-Appellant.

Sheldon E. Friedman (Blain D. Myhre of Isaacson, Rosenbaum, Woods & Levy, Denver, Colorado; and Carl L. Lathrop of Lathrop & Rutledge, Cheyenne, Wyoming, with him on the brief) of Isaacson, Rosenbaum, Woods & Levy, Denver, Colorado, for Defendant-Appellee.

---

Before **BRORBY, McKAY** and **MURPHY**, Circuit Judges.

---

**BRORBY**, Circuit Judge.

---

This controversy arises from agreements executed for the sale and "lease back" of a shopping center known as the "Wyoming Plaza" located in Cheyenne, Wyoming. Appellant Mile High Industries (Mile High), a Wyoming corporation, as seller and lessee of the property, brought a diversity action for declaratory judgment in federal district court, pursuant to 28 U.S.C. § 1332, against Robert L. Cohen, a Colorado citizen and the buyer and lessor under the agreements. Mr. Cohen counterclaimed, also seeking declaratory judgment. Mile High appeals the district court's decision granting declaratory judgment to Mr. Cohen. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

I. FACTUAL BACKGROUND

For the purpose of ruling on the parties' requests for declaratory judgment, the district court made the following findings of fact. In April 1970, Mile High and Mr. Cohen entered into a Purchase Agreement for the sale and "lease back" of the Wyoming Plaza shopping center located in Cheyenne, Wyoming. Under the terms of the Purchase Agreement, Mr. Cohen agreed to pay $1,378,000 for the shopping center, with the total purchase price consisting of: 1) a cash payment of $177,250 to Mile High; 2) assumption of Mile High's mortgage with Jefferson Standard Life Insurance (Jefferson Standard) in the amount of $825,000; and 3) a promissory note and second mortgage (Mortgage) in favor of Mile High for

$325,750.[1]  In turn, Mile High agreed to sell the shopping center to, and lease it back from, Mr. Cohen for a sixteen-year term.  Pursuant to the terms of the Purchase Agreement, Mr. Cohen executed a Promissory Note and a Mortgage in favor of Mile High, and the parties executed a sixteen-year lease agreement.

The documents executed as part of the sale and "lease back" of the shopping center tied Mr. Cohen's performance on both the Promissory Note and Mortgage to Mile High's performance of its obligations under the Lease Agreement.  Specifically, the Promissory Note provided:

> This note is executed subject to the terms of those certain agreements concerning the sale and lease of the real property pledged as security for this note.  *In the event that the named payee of this note [Mile High] ... defaults under the terms of the lease agreement ..., or the terms of the purchase agreement ..., then no further payments are required to be made hereunder and any remaining balance due is, in accordance with said agreements, declared null, void and of no further force or effect.*

(Emphasis added).  Similarly, the rider to the Mortgage from Mr. Cohen to Mile High provided:

> This mortgage is executed subject to the terms of those certain agreements concerning the sale and lease of the real property herein described.  *In the event the Mortgagee [Mile High] ... defaults under the terms of the lease agreement ..., or the terms of the purchase*

---

[1]  Although the district court incorrectly listed the amount of the mortgage at $325,000, the error is harmless as it is irrelevant to our disposition.

*agreement ..., then no further payments are required to be made under the terms of the note secured by this mortgage, and any remaining balance due is, in accordance with said agreements, declared null, void and of no further force or effect*, in which event this mortgage shall be deemed null, void and of no further force and effect, and the holder thereof [Mile High] shall execute any and all releases required.

(Emphasis added.)

Consistent with the terms of the Promissory Note and the Mortgage, the Purchase Agreement provided:

Said mortgage shall further provide that in the event [Mile High] or its assigns should default in the payment of rental provided under the lease obligation ..., [Mr. Cohen] *shall automatically be released from any further obligation in regard to either the mortgage or the aforesaid note.*

(Emphasis added). In addition to this default provision, the Purchase Agreement also provided:

Commencing with the fifth year of said note [*i.e.* 1975], [Mr. Cohen] shall make payments equal to the amortization payments as reflected in the attached Schedule B; providing [Mr. Cohen] receives net rental of $138,000.00 per year. If [Mr. Cohen] receives rental less than $138,000.00 per year, no payments will be due to [Mile High] on said note.

The Lease Agreement required Mile High to pay $11,500 in monthly lease payments by the first day of each month, plus all costs of upkeep, maintenance, repairs, utilities, taxes and insurance.

On May 1, 1971, the parties amended the Lease Agreement, allowing Mile High to pay its rent on the tenth, rather than the first, day of the month. In turn, the parties agreed an automatic default would occur if Mile High failed to pay its rent on time, eliminating the requirement that Mr. Cohen provide Mile High ten days' written notice of Mile High's default in payment of rent.

In 1979, Mile High sought to obtain a lien release from Jefferson Standard on a 4.69 acre parcel owned by Mile High but encumbered by the Jefferson Standard mortgage assumed by Mr. Cohen. By letter dated August 29, 1979, Mile High's President, James P. Federer, informed Mr. Cohen:

> Jefferson Standard is not willing to release their Mortgage even though I escrow the money. It looks like the only answer is for me to pay the $50,000.00 on the First Mortgage to Jefferson Standard and *to get you to agree to add it to the Mortgage balance owed by you to us.* I believe the interest rate is the same, if not we would adjust it to be the same as the Jefferson Standard rate and it would be paid out on the end of the Jefferson Mortgage.

> If when you receive the notice from Jefferson Standard of the payment on the Mortgage principal, I would appreciate a letter stating you have received the notice of payment and agreeing to pay to us at the end like sum of money on the same term.

(Emphasis added). In a September 5, 1979 letter, Mr. Cohen stated he did not object to the procedure outlined in Mr. Federer's August 29 letter, and as soon as he received notification from Jefferson Standard, he would "prepare a suitable letter for your files." Subsequently, Mile High paid the $50,000 and received a

release of the lien on its 4.69-acre tract. However, Mr. Cohen never wrote the referenced letter.

During the active term of the Lease Agreement, Mr. Cohen experienced various defaults and breaches of the agreement by Mile High. Concern over Mile High's ability to perform under the Lease Agreement precipitated the parties' practice and unwritten agreement that Mile High would make its lease payments to Mr. Cohen prior to Mr. Cohen making quarterly mortgage payments to Mile High.[2]

Ultimately, a series of events occurred in October 1981 leading to the instant litigation. To begin, Mile High failed to make the lease payment due October 10, 1981. In the meantime, Mr. Cohen did not make the September 30, 1981 payment on his Mortgage with Mile High because of the parties' understanding the mortgage payments would be made only after receipt of Mile High's monthly lease payment. On October 23, 1981, Mr. Cohen wrote to his

---

[2] Although Mile High contests the district court's finding the parties agreed Mr. Cohen's payment would not be due until he received Mile High's rent payment (May 9, 2000 oral argument), the district court correctly found Mr. Federer's testimony did not refute this finding, and, in fact, the record reflects this to be the parties' established practice.

attorney, stating:

> I am having increasing difficulty with Jim Federer [of Mile High] in payment of his rent. He still has not paid the rent for the month of October nor have I paid him the payment on the second [mortgage] due early October.
>
> I would appreciate it if you would get out these agreements and see what our next step is. We are all right this month since I owed him as much as he owed me, however, beginning the next month if we do not get rent from him we are going to have difficulty making our mortgage payments. It might, therefore, be to our advantage to move quickly to declare the lease terminated and instruct all tenants to pay us directly.[3]

By letter dated October 27, 1981, Mr. Cohen's attorney sent Mile High a notice of default for October's rent. A few days later, Mile High sent Mr. Cohen a check dated November 2, 1981, in the amount of $11,000 – instead of the

---

[3] In referencing this letter, the district court correctly pointed out the Lease Agreement provided for an offset of Mr. Cohen's mortgage payments with Mile High's lease payments, dependent on Mile High's written notice to Mr. Cohen of such an offset. The district court also suggested Mr. Cohen's letter showed his willingness to allow Mile High to offset the October payment against Mr. Cohen's September mortgage payment due Mile High. However, the evidence in the record shows Mr. Cohen never communicated to Mile High any willingness to offset the payments, and instead, clearly notified Mile High of its default. More importantly, Mr. Federer testified he never gave formal written notice to Mr. Cohen, as required by the Lease Agreement, of any intent to offset the mortgage payment against the lease paymen; nor do we find any testimony he verbally notified Mr. Cohen of an intended offset. Thus, the weight of the evidence supports the district court's ultimate findings and conclusions that Mile High defaulted on the October lease payment and that Mr. Cohen clearly notified Mile High of its default.

$11,500 due for October's rent. When Mile High did not make its $11,500 November lease payment by the tenth, Mr. Cohen's attorney sent a letter dated November 13, 1981, acknowledging receipt of the $11,000 check, but stating Mile High was "still in default under the lease" because it owed a total of $500 for October's rent, $11,500 for November's rent, plus $8,300 for insurance due on the building. The letter ended by stating "this letter shall serve as further notice of default and in the event Mr. Cohen does not have certified funds in his hands in the amount of $8,800 [*i.e.*, $8,300 insurance and $500 October rent] within ten (10) days, we shall take such action as may be necessary to protect our client's interest." Mile High never paid the $8,300 for the unpaid insurance, $500 for the outstanding October rent, $11,500 for November's rent, or any real estate taxes due in 1981.

On December 2, 1981, Mr. Cohen's attorney sent a letter to Mr. Federer giving him written notice Mr. Cohen was "terminating said lease [as of] December 2, 1981." On receipt of the letter, Mile High voluntarily surrendered possession of the shopping center to Mr. Cohen. The next day, Mile High sent a letter advising all shopping center sub-lessees to pay their rent to Mr. Cohen. Because Mile High failed to fully pay its 1981 lease payments, Mr. Cohen received only $110,000 of the $138,000 in 1981 lease payments due from Mile

-8-

High under the Purchase Agreement, which states "[i]f Buyer receives rental less than $138,000.00 per year, no payments will be due to Seller on said note."

From December 2, 1981, Mr. Cohen has operated the shopping center and paid all expenditures associated with it, including maintenance, repairs, utilities, taxes, and insurance. Mr. Cohen also paid off the $825,000 mortgage with Jefferson Standard, less the $50,000 paid by Mile High for the release of the lien on the 4.69 acres of real estate.

## II. PROCEDURAL BACKGROUND

In late 1983, after Mile High refused to execute a release of the Mortgage and Promissory Note, Mr. Cohen sought declaratory judgment against Mile High in Colorado federal district court, asking for extinguishment and cancellation of the Promissory Note and Mortgage with Mile High as of December 2, 1981, when Mr. Cohen terminated Mile High's Lease Agreement. Mile High counterclaimed for the balance due on the Promissory Note and Mortgage and sought foreclosure of the Mortgage. In July 1985, prior to trial, Mile High filed a petition for Chapter 11 bankruptcy relief causing closure of the Colorado declaratory action. On a bankruptcy schedule, entitled "Property Not Otherwise Scheduled," Mile High listed the value of the Promissory Note and Mortgage with Mr. Cohen at

$219,788, which included the $50,000 paid by Mile High on Jefferson Standard's mortgage. However, neither Mile High nor its bankruptcy trustee brought an action to collect on the Promissory Note or to foreclose on the Mortgage during the pendency of the bankruptcy. In 1989, the bankruptcy court approved Mile High's proposed reorganization plan, but any claims between Mr. Cohen and Mile High were excepted from the approved plan.

More than eleven years after Mr. Cohen terminated the Lease Agreement and four years after approval of its bankruptcy reorganization plan, Mile High filed the complaint initiating this action. In its initial March 12, 1993 complaint, Mile High sought a decree of foreclosure on the Mortgage with Mr. Cohen and a declaratory judgment for the balance and interest owed by Mr. Cohen under the Promissory Note and Mortgage, "including $50,000 added by agreement." Mile High did not make a jury trial demand in its complaint. Mr. Cohen filed an answer claiming forfeiture because the Promissory Note was extinguished on termination of the Lease Agreement, and a counterclaim seeking declaratory judgment for the extinguishment and cancellation of the Promissory Note and Mortgage, effective on the date Mile High defaulted on the Lease Agreement.

In July 1993, Mile High amended its complaint omitting its prayer for a

monetary deficiency judgment against Mr. Cohen on the unpaid balance of the Mortgage and instead sought satisfaction of any judgment by foreclosure sale. Mile High also renewed its request for a monetary award of $50,000 plus interest for the payment it made to Jefferson Standard on the mortgage assumed by Mr. Cohen. Again, Mile High did not demand a jury trial.

Thereafter, Mr. Cohen filed his answer to the amended complaint renewing his claim of forfeiture and amending his counterclaim to also request $50,000 for the balance due on the October and November 1981 rental payments, and for damages and expenditures Mr. Cohen incurred before the Lease Agreement's termination on December 2, 1981. Shortly thereafter, Mr. Cohen filed an amended answer asserting additional affirmative defenses, including violation of the statute of limitations, laches and estoppel by acquiescence.

On September 7, 1993, Mile High filed a jury demand under Rule 38 of the Federal Rules of Civil Procedure. In response, Mr. Cohen filed a motion to strike the jury demand as untimely, claiming the amended pleadings did not revive Mile High's right to demand a jury trial on issues already framed by the original pleadings. After a hearing on the matter, the magistrate judge granted Mr. Cohen's motion to strike, which the district court affirmed.

Following a bench trial, the district court issued its judgment declaring neither party could recover monetary damages from the other. The district court further declared: 1) the Lease Agreement forfeited and surrendered by operation of law; 2) all indebtedness due under the Promissory Note, including the additional $50,000, fully extinguished and canceled, and any indebtedness by Mr. Cohen to Mile High satisfied; and 3) the Mortgage to Mile High from Mr. Cohen canceled as of December 2, 1981, null, void and of no further force and effect, and no longer a lien against the Wyoming Plaza shopping center. In addition, the district court applied the doctrine of laches and estopped Mile High from seeking foreclosure because "Mile High failed to take any affirmative steps in a timely manner to pursue its claimed rights and/or property interests in the Note, Mortgage and Lease Agreement."

On appeal, Mile High claims the district court erred in: 1) forfeiting the unpaid balance on the Mortgage with Mr. Cohen; 2) forfeiting the $50,000 advance payment Mile High made on the Jefferson Standard mortgage; 3) denying it a jury trial on new issues raised by Mr. Cohen's affirmative defenses; and 4) applying laches, estoppel and acquiescence in reaching its decision. Conversely, Mr. Cohen supports the district court's decision in all respects.

III.  DISCUSSION

A.  Default of Lease Agreement and Forfeiture of the Mortgage Balance

Mile High argues the district court erred in granting declaratory judgment to Mr. Cohen because it never defaulted on the Lease Agreement other than a failure to pay a mere $23 on its November payment.  Mile High arrives at this figure by claiming Mr. Cohen orally agreed to offset Mile High's $11,500 October payment with his quarterly $11,977 mortgage payment, leaving a $477 balance to be applied to Mile High's November payment.  Because Mile High applied the $477 balance toward its November payment and then paid an additional $11,000, Mile High claims it was in default for only $23 – or the difference between $11,500 and $11,477.  Mile High further claims it did not default on the $8,300 insurance payment because Mr. Cohen failed to provide notice of the obligation to make the payment, and no deficiency existed until Mile High received notice or an authenticated bill for verification.  Mile High also asserts it was not obligated to pay the real estate taxes until December 31, 1981.  In making these assertions, Mile High acknowledges its heavy burden in attacking the trial court's factual findings and that a "substantiated conflict in relevant evidence" must exist.

The district court's findings as to the various breaches of Mile High's

Lease Agreement are factual determinations subject only to the clearly erroneous standard of review on appeal. Fed. R. Civ. P. 52(a); *see also Kerr-McGee Corp. v. Bokum Corp.*, 453 F.2d 1067, 1072 (10th Cir. 1972). Moreover, we give the trial court's credibility determinations due deference. Fed. R. Civ. P. 52(a); *see also Mid-West Conveyor Co., Inc. v. Jervis B. Webb Co.*, 92 F.3d 992, 997 (10th Cir. 1996).

In this case, the district court determined Mile High defaulted on the lease agreement because it failed to make the $11,500 October lease payment to Mr. Cohen. When Mile High paid Mr. Cohen $11,000 in early November, it remained in default for $500 on the unpaid balance of October's rental payment, in addition to the $11,500 for November's rent, and unpaid insurance and real estate taxes. In determining Mile High's default precipitated forfeiture of the balance due under the Promissory Note and Mortgage, the district court found the documents, executed as part of the sale and "lease back" of the shopping center, to be "clear and unambiguous and memorialize[d] the parties' transaction," and plainly prescribed forfeiture on Mile High's default. The district court further held that while forfeiture of the amount due under the Promissory Note and Mortgage may appear harsh, it "was within the contemplation of the parties when they entered into this business transaction."

In reviewing these findings, we note the district court correctly determined the documents at issue were clear and unambiguous, and contemplated forfeiture of the balance due from Mr. Cohen on the Promissory Note and Mortgage in the event Mile High defaulted on the Lease Agreement. Under the amended provision of the Lease Agreement, it is also clear Mile High's rental payment was due no later than October 10, and an automatic default would occur if it failed to pay its rent on time. Moreover, the evidence in the record supports the district court's determination the parties' practice and unwritten agreement over the years required Mile High to make its lease payments prior to Mr. Cohen making quarterly mortgage payments to Mile High. Thus, when Mile High failed to pay Mr. Cohen $11,500 on October 10, 1981, and later failed to pay the full sum due, as well as the insurance payment required under the Lease Agreement, Mile High was in default regardless of whether Mr. Cohen made his quarterly payment. While the Lease Agreement permits Mile High to offset its lease payments with the mortgage payments, such an offset depended on Mile High's written notice to Mr. Cohen. The evidence in the record clearly shows Mr. Federer never gave formal written notice to Mr. Cohen of any intent to offset the mortgage payment against the lease payment, and Mr. Federer did not testify he verbally notified Mr. Cohen of an intended offset. Similarly, Mr. Cohen did not communicate to Mile High any willingness to offset the payments. To the contrary, he clearly notified

Mile High of its default.

While Mile High contends in its appeal brief that Mr. Cohen orally agreed to offset the payments, it fails to provide a record reference for its contention.[4] Similarly, Mile High fails to reference any portion of the record to support its contentions that it never received notice the insurance payment was due, and it was not required to pay the real estate taxes until December 1981.[5] In order to carry its burden of proving the district court's factual errors, Mile High must provide this court with the essential references to the record on which it relies. *See S.E.C. v. Thomas*, 965 F.2d 825, 827 (10th Cir. 1992). Because Mile High failed to reference the record in support of its contentions, we will not consider

---

[4] The only document this court found that lends support to Mile High's contention is a statement in a January 11, 1982 letter in which Mile High informed Mr. Cohen's attorney that "[t]he one month's rent due Cohen was authorized to be withheld from this payment by phone." However, the letter does not indicate what month, *i.e.*, October or November, was to be offset or who allegedly authorized it. Under the circumstances, the district court obviously credited Mr. Cohen's testimony that neither he nor his agents authorized an offset, which is supported by Mr. Federer's failure to testify that authorization ever occurred.

[5] Moreover, it is clear Mile High received notice of its default on the insurance payment and an opportunity to pay the amount due. Specifically, Mr. Cohen's attorney notified Mile High of its insurance payment default in a letter dated November 13, 1981, and directed the payment be made within ten days. Mile High never paid the $8,300 for the unpaid insurance, leading, in part, to the December 2, 1981 notice of termination of the Lease Agreement.

them or sift through the record in support thereof, but instead defer to the district court's rulings. *Id.*

Thus, under the circumstances presented, we hold the district court's finding Mile High defaulted under the terms of the Lease Agreement is not clearly erroneous. Based on the clear, unambiguous terms of the parties' agreements and Mile High's subsequent default, the district court also did not err in holding the Lease Agreement terminated December 2, 1981, the Promissory Note and Mortgage null, void and of no further force and effect, and the unpaid balance of the Promissory Note and Mortgage forfeited. For these reasons, the district court properly awarded declaratory judgment to Mr. Cohen.

B.  Forfeiture of $50,000 Advance Payment on the Jefferson Standard Mortgage

Mile High contends the district court erred in determining Mr. Cohen did not owe Mile High $50,000 – the amount paid on the Jefferson Standard mortgage in order to obtain a release of the lien on its 4.69 acres of real estate. Specifically, Mile High contends the court erred in determining the $50,000 payment owed by Mr. Cohen was added to the Mortgage and Promissory Note between Mile High and Mr. Cohen. Instead, Mile High contends the $50,000 constituted an independent transaction based on an entirely separate agreement,

which Mr. Cohen was obligated to pay after he paid the last installment of the Jefferson Standard mortgage.

Under Wyoming law, issues such as whether a contract has been entered into and the terms of the alleged contract are generally questions of fact for resolution by the fact finder. *See Deepwater Inv., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1112 & n.11 (10th Cir. 1991). The district court's findings as to the parties' agreement on the repayment of the $50,000 is a factual determination subject only to the clearly erroneous standard of review on appeal. Fed. R. Civ. P. 52(a). "A finding of fact is not clearly erroneous unless it is without factual support in the record, or if the appellate court, after reviewing all the evidence, is left with the definite and firm conviction that a mistake has been made." *Mid-West Conveyor Co.*, 92 F.3d at 997-98 (quotation marks and citation omitted).

In this case, the record supports the district court's determination the parties intended to add the $50,000 payment to Mr. Cohen's Mortgage and Promissory Note. In his letter dated August 29, 1979, Mr. Federer informed Mr. Cohen the only answer to obtaining the release he needed was for Mile High "to pay the $50,000.00 on the First Mortgage to Jefferson Standard and *to get you to agree to add it to the Mortgage balance owed by you to us*." (Emphasis added).

In response, Mr. Cohen stated he did not object to the procedure outlined in Mr. Federer's August 29 letter, which he testified he understood as adding $50,000 to the Mortgage balance. Mr. Federer clarified this was the parties' intention when he later testified the $219,788 due under the Promissory Note and Mortgage, as listed on Mile High's bankruptcy schedule, included the $50,000 paid by Mile High on Jefferson Standard's mortgage.[6] Under these circumstances, the district court's factual finding the parties included the $50,000 in the Promissory Note and Mortgage was not clearly erroneous. Because the parties added this amount to the Mortgage and Promissory Note, which were later declared null and void, the district court correctly concluded Mile High's default of the Lease Agreement also caused forfeiture of the $50,000.

C. Right to a Jury Trial

As a procedural matter, Mile High argues the district court erred in striking its demand for a jury trial. Mile High asserts it had a right to a jury trial based on the affirmative defenses of laches, estoppel and acquiescence raised in Mr.

---

[6] While Mr. Federer offered conflicting testimony saying the parties understood the $50,000 would be paid as a separate transaction, we give the trial court's credibility determinations great deference. Fed. R. Civ. P. 52(a); *see also Mid-West Conveyor Co.*, 92 F.3d at 997.

Cohen's amended answer.[7] In support of this assertion, Mile High alleges:

> The interjection of acquiescence, estoppel, and latches [sic] ...
> entirely changed the character of [the] litigation. The matrix of facts
> and the period of time involved, as well as a completely different
> theory of defense should meet the test of new issues as required
> under the law to authenticate a requested jury after a waiver of jury
> on the prior issues had existed.

Specifically, Mile High claims the period of time initially at issue concerned only the operative events associated with termination of its lease during October, November, and the first few days of December 1981. However, after introduction of the affirmative defenses, Mile High asserts the time frame changed to include the time during which Mile High failed to litigate its forfeiture claim – from December 2, 1981 to March 12, 1993 when it filed the instant action. Thus, Mile High argues Mr. Cohen's affirmative defenses raise new issues concerning matters of law and requiring a jury determination. In making this assertion, Mile High acknowledges its right to a jury trial extends only to the new issues introduced by Mr. Cohen's amended answer, and not to any issues previously raised by the pleadings, including its foreclosure action which it admits is equitable in nature. However, Mile High contends its right to a jury trial was

---

[7] While Mile High characterizes Mr. Cohen's affirmative defenses as three defenses consisting of laches, estoppel, and acquiescence, we read Mr. Cohen's defenses to include only laches and "estoppel by acquiescence," as discussed later.

revived under Fed. R. Civ. P. 38 when Mr. Cohen raised the affirmative defenses of acquiescence, laches and estoppel.

Whether Mile High was entitled to a jury trial is a question of law we review *de novo.  See Fischer Imaging Corp. v. General Elec. Co.*, 187 F.3d 1165, 1168 (10th Cir. 1999) (citing *Manning v. United States*, 146 F.3d 808, 811 (10th Cir. 1998)), and *Bowdry v. United Airlines, Inc.*, 58 F.3d 1483, 1489 (10th Cir. 1995).[8]  In the instant case, the district court determined Mile High did not have a right to a jury because:

> [T]he entire case, as to both [Mile High] and [Mr. Cohen], appears to hinge upon the terms and requirements of the parties' various agreements, particularly with regard to the promissory note and all issues related to nonpayment.  Even though [Mr. Cohen] asserted the four additional affirmative defenses, nothing has really changed the

---

[8]  Both parties incorrectly purport that our standard of review in this case is abuse of discretion.  We review the district court's determination to either grant or deny a jury trial for an abuse of discretion when the jury demand is untimely and the trial court exercises its discretion to nevertheless allow a jury trial under Fed. R. Civ. P. 39.  *See Dill v. City of Edmond*, 155 F.3d 1193, 1208 (10th Cir. 1998); *FDIC v. Palermo*, 815 F.2d 1329, 1333-34 (10th Cir. 1987); *Paramount Pictures Corp. v. Thompson Theatres, Inc.*, 621 F.2d 1088, 1090 (10th Cir. 1980).  In this case, Mile High timely filed its jury demand within ten days of Mr. Cohen's amended answer.  *See* Fed. R. Civ. P. 38 (stating a demand for a jury trial must be made within ten days of the last pleading directed to the new issue); *see also Palermo*, 815 F.2d at 1333.  Thus, the issue before us pertains not to the timeliness of Mile High's request, but to the district court's decision on the merits as to whether the affirmative defenses raised new issues affording Mile High a right to a jury trial, which would revive its initial waiver of a jury.

basic issues that must be resolved during the course of the trial. The general nature of the parties' dispute has not changed and the ultimate decisions to be made during the course of trial do not appear to be different.

Consequently, the district court held Mile High's jury demand did not revive its previously waived right to a jury trial.

In reviewing the district court's decision, we must determine if this "action involves rights and remedies of the sort traditionally enforced in an action at law, rather than an action in equity." *Fischer*, 187 F.3d at 1168 (quotation marks and citation omitted). This distinction is critical because the Seventh Amendment right to a jury trial attaches to actions at law, not to those in equity. *See Manning*, 146 F.3d at 811-12. Whether a case is entitled to a jury trial is a decision that must be made according to federal law in diversity cases. *See Kerr-McGee*, 453 F.2d at 1071 (relying on *Simler v. Conner*, 372 U.S. 221, 222 (1963)). "In diversity cases, ... the substantive dimension of the claim asserted finds its source in state law, but the characterization of that state-created claim as legal or equitable for purposes of whether a right to jury trial is indicated must be made by recourse to federal law."[9] *Simler*, 372 U.S. at 222 (citations omitted).

---

[9] In this case, both parties relied primarily on Wyoming cases to support their positions. While we rely on federal law in this diversity case to determine whether the affirmative defenses at issue are legal or equitable, we note that in Wyoming, where the property is located and the applicable documents recorded,

Under federal law, "the right to a jury trial is not determined by the form of the complaint, but by an appraisal of the claims, defenses, and remedies" sought. *Kerr-McGee*, 453 F.2d at 1071. In other words, "[i]t is the issues, not the form of the complaint, that will determine the method of trial." *Id.*[10] The fact both parties in this case requested a declaratory judgment on their rights is not decisive. A request for declaratory relief "may be legal or equitable depending on the 'basic nature of the underlying issues.'" *Fischer*, 187 F.3d at 1168 (quoting *United States v. New Mexico*, 642 F.2d 397, 400 (10th Cir. 1981)); *see also Ferguson*, 739 P.2d at 759 (applying the same logic under Wyoming law).

Proceeding under these principles, the foreclosure issue presented by Mile High was clearly equitable in nature. "The foreclosure of mortgage liens is equitable in nature and such actions may be tried in the Federal courts without intervention of a jury." *Rozelle v. Connecticut Gen. Life Ins. Co.*, 471 F.2d 29, 31

_____

the law is similar to federal law and we therefore reference applicable Wyoming cases merely as additional, supplemental authority.

[10] The same principle applies under Wyoming law. *See, e.g., Ferguson v. Ferguson*, 739 P.2d 754, 758 (Wyo. 1987) (holding determination of whether an action is legal or equitable in nature depends on "an examination of the entire pleadings and all the issues raised [and] not merely [on] 'the plaintiff's declaration, complaint, or petition, or his evidence.'" (Quoting *Davidek v. Wyoming Inv. Co.*, 308 P.2d 941, 946 (Wyo. 1957)).

(10th Cir. 1972), *cert. denied*, 411 U.S. 921 (1973).[11]  Similarly, Mr. Cohen's counterclaim for cancellation of the Lease Agreement and other agreements constituted an equitable issue triable by the court.  *See Kerr-McGee*, 453 F.2d at 1072; *see also Davidek*, 308 P.2d at 946; *Goodson v. Smith*, 243 P.2d 163, 176 (Wyo. 1952).  Moreover, Mile High acknowledged it did not initially make a jury demand because it believed the foreclosure action and other issues presented by the parties in the initial pleadings were equitable in nature.  For these reasons, we conclude the initial claims and defenses raised presented equitable issues triable by the district court.

Having made this determination, we turn to the linchpin of Mile High's argument, which centers on its claim the affirmative defenses of laches, estoppel and acquiescence presented new issues requiring a jury trial.  The district court determined the defenses raised by Mr. Cohen related directly to the issue of Mile High's foreclosure action so that "nothing has really changed the basic issues that must be resolved during the course of the trial."  We agree.

---

[11]  Likewise, in Wyoming, an action for foreclosure on a mortgage is considered equitable in nature.  *See Chopping v. First Nat'l Bank*, 419 P.2d 710, 713 (Wyo. 1966), *cert. denied*, 387 U.S. 935 (1967); *see also Lellman v. Mills*, 87 P. 985, 994 (Wyo. 1906) (holding action to set aside mortgage is "purely equitable in character [and] triable by the court").

We begin by noting Mr. Cohen's affirmative defenses of laches and estoppel by acquiescence were meant to apply squarely to the issue of Mile High's foreclosure action and were raised for the sole purpose of defending against that action. Mr. Cohen began by asserting the statute of limitations should be applied against Mile High as a defense to its foreclosure action, and alternatively, alleged Mile High: 1) "was guilty of laches" in failing to seek relief and 2) should be "estopped" from bringing a foreclosure action based on Mile High's "acquiescence" in surrendering possession of the building and failure to bring a foreclosure action to obtain possession of the shopping center Our appraisal of the general nature of Mile High's foreclosure claim and Mr. Cohen's defenses shows they related directly to the basic issue of foreclosure, as initially raised in the pleadings, leaving us with the firm conviction the issues involved here are the sort traditionally enforced in equity.

Our conclusion is reinforced when we look at the nature and application of the affirmative defenses at issue. We have said "the issue of laches depends on whether 'equitable relief cannot be afforded without doing injustice.'" *Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1337 (10th Cir. 1982) (quoting *Penn Mut. Life Ins. Co. v. City of Austin*, 168 U.S. 685, 698 (1898)). Laches is considered "an equitable defense, controlled by equitable considerations."

*Halstead v. Grinnan*, 152 U.S. 412, 417 (1894); *see also Anderson v. Wyoming Dev. Co.*, 154 P.2d 318, 345-346 (Wyo. 1944). "As with other equitable defenses, the existence of laches 'is a question primarily addressed to the discretion of the trial court.'" *Jicarilla,* 687 F.2d at 1337 (quoting *Burnett v. New York Cent. R.R. Co.*, 380 U.S. 424, 435 (1965)). Thus, applying these principles, we hold the issue of laches in this case lies in equity, and is triable by the court and not a jury. Accordingly, even if this defense somehow introduced a new "matrix of facts" as claimed by Mile High, it remained an equitable issue triable by the district court.

We next turn to the more complicated issue of the affirmative defense of equitable estoppel by acquiescence.[12] In determining whether the issue of

---

[12] Wyoming law recognizes various forms of "equitable estoppel," including, for example, laches, promissory estoppel, estoppel by acquiescence, estoppel by fraudulent concealment or fraud, and estoppel in pais. *See, e.g.*, *Beadle v. Daniels*, 362 P.2d 128, 131 (Wyo. 1961) (explaining the element of injury, prejudice or disadvantage is necessary under the doctrine of laches to estop plaintiff from maintaining suit); *Loghry v. Unicover Corp.*, 927 P.2d 706, 710 (Wyo. 1996) (holding promissory estoppel requires a promise to be made which induces action or forbearance); *McCarthy v. Union Pac. Ry. Co.*, 131 P.2d 326, 330, 332 (Wyo. 1942) (concluding elements of knowledge and acquiescence are necessary for estoppel by acquiescence); *Olson v. A.H. Robins Co.*, 696 P.2d 1294, 1299 (Wyo. 1985) (applying equitable estoppel because of fraudulent concealment to prevent use of the statute of limitations as a defense); *Bauer v. State*, 695 P.2d 1048, 1050-51 (Wyo. 1985) (holding fraud will equitably estop statute of limitations); *Crosby v. Estate of Strahan*, 324 P.2d 492, 496-98 (Wyo. 1958) (discussing elements necessary for estoppel in pais). Our reading of Mr. Cohen's amended answer convinces us he sought only the affirmative defenses of laches and estoppel by acquiescence. Accordingly, we find Mile High's reliance

estoppel by acquiescence is an issue triable by a court, we find no federal law to assist us. Consequently, we look to Wyoming law to shed light on the issue. *See FDIC v. Kansas Bankers Sur. Co.*, 963 F.2d 289, 294 (10th Cir. 1992.) Moreover, because we will examine and compare the elements of both laches and estoppel by acquiescence in making our determination, we are examining the "substantive dimension" of these defenses and thus, must apply state law. *See Simler*, 372 U.S. at 222.

Like other states, Wyoming recognizes the defense of estoppel by acquiescence. This defense requires the one against whom it is asserted to have known of, or been able to ascertain, the facts from which the estoppel arose, but nevertheless acquiesced without asserting his or her rights. *See generally McCarthy*, 131 P.2d at 330, 332. *Accord Zivich v. Mentor Soccer Club, Inc.*, 1997 WL 203646 at *12 (Ohio Ct. App. 1997) (holding under doctrine of estoppel by acquiescence a plaintiff loses his rights against a defendant if he committed some act amounting to an assurance he would not assert his rights) (unpublished opinion); *Schiltz v. Teledirect Int'l, Inc.*, 524 N.W.2d 671, 674 (Iowa Ct. App. 1994) (holding "[e]stoppel by acquiescence occurs when a person knows or ought

---

on cases concerning other forms of equitable estoppel unhelpful in making our determination.

to know of an entitlement to enforce a right and neglects to do so for such time as would imply an intention to waive or abandon the right"); *City of Hammond v. Welsh*, 67 N.E.2d 390, 393 (Ind. 1946) (holding "[t]he rule of estoppel by acquiescence is inoperative unless it appears that the party against whom it is invoked was fully aware of his rights, or was negligent in failing to acquire such knowledge" (quotation marks and citation omitted)).

We note under Wyoming law laches and estoppel by acquiescence are very similar. First, laches is also a form of equitable estoppel. *See Squaw Mountain Cattle Co. v. Bowen*, 804 P.2d 1292, 1297 (Wyo. 1991). Second, like estoppel by acquiescence, laches also requires knowledge of the relevant facts and acquiescence. *See Jicarilla*, 687 F.2d at 1338 (concluding laches exists "where a party, having knowledge of the relevant facts, acquiesces for an unreasonable length of time in the assertion of a right adverse to his own"); *see also First Nat'l Bank v. First Wyoming Sav. and Loan Ass'n.*, 592 P.2d 697, 702 (Wyo. 1979) (concluding "the laches defense is reserved for those rare cases where a protracted acquiescence by plaintiff induces a defendant to undertake substantial activities in reliance on the acquiescence"). However, unlike estoppel by acquiescence, laches also requires additional findings of "(a) unreasonable delay in bringing suit by the party against whom the defense is asserted and (b)

prejudice to the party asserting the defense as a result of this delay." *Jicarilla*, 687 F.2d at 1338. Unlike laches, estoppel by acquiescence does not require the additional showing of prejudice because it focuses on the actions of the party holding the right to determine if that party waived its right. *See Thurn v. Thurn*, 310 N.W.2d 539, 541 (Iowa Ct. App. 1981). In other words, the defense of estoppel by acquiescence focuses on the party against whom the defense is asserted to see if that party waived its right, while the defense of laches concentrates on the position of the party asserting the defense to see if he or she was prejudiced.

Despite this difference, it is clear laches and estoppel by acquiescence both require the same showing of knowledge and acquiescence. It follows then that if the elements required for a finding of laches, including the additional elements of prejudice and unreasonable delay, are determined in equity and triable by the court, then the same, but fewer elements required for a finding of estoppel by acquiescence – *i.e.*, knowledge and acquiescence – likewise present an issue triable by the court.

Mile High's reliance on a plethora of Wyoming and Tenth Circuit cases requiring a jury to determine issues relating to "promissory estoppel" does not

dissuade us from our decision. These cases are inapplicable because, as they explain, "promissory estoppel" is an affirmative cause of action or defense, which arises in instances where no formal contract exists and the party seeking promissory estoppel is attempting to prove the existence of an enforceable promise or agreement. *See State Farm Mut. Auto. Ins. Co. v. Petsch*, 261 F.2d 331, 335 (10th Cir. 1958); *Loghry*, 927 P.2d at 710; *Verschoor*, 907 P.2d at 1298; *Michie v. Board of Trustees*, 847 P.2d 1006, 1009 (Wyo. 1993); *see also* 28 Am. Jur. 2d *Estoppel and Waiver* § 57 (2000). In this case, Mr. Cohen did not seek "promissory estoppel" to defend against foreclosure based on any unfulfilled promise or informal agreement and therefore, he was under no obligation to prove such a promise or informal agreement existed. Rather, he sought the affirmative defense of "estoppel by acquiescence" which, as previously discussed, is a defense similar to laches – an issue in equity and triable by the court.

Because Mr. Cohen raised the affirmative defenses of laches and estoppel by acquiescence for the purpose of defending against the equitable issue of foreclosure, and these defenses are also equitable in nature and triable by the court, we hold the district court did not err in striking Mile High's jury demand.

D. Application of Laches and Estoppel by Acquiescence

In a related argument, Mile High contends the district court erred in applying laches, estoppel and acquiescence to justify forfeiture of the balance due on the Promissory Note and Mortgage. Mile High contends the application of these defenses unjustifiably excused Mr. Cohen from paying a debt legitimately due Mile High. In further support of its contentions, Mile High claims the record is absent of any showing of detriment to Mr. Cohen as required for laches, or the elements required for estoppel and acquiescence.

In this case, the district court first determined Mile High defaulted on the Lease Agreement, and that under the express terms of all the agreements, the entire balance due on the Promissory Note and Mortgage was extinguished and forfeited by Mile High. Thus, even without a determination on Mr. Cohen's affirmative defenses, the district court ruled in favor of Mr. Cohen and thereby precluded Mile High's foreclosure action. However, in addition to this ruling, the district court also applied the doctrine of laches because of Mile High's failure to pursue its claims against Mr. Cohen, and estopped Mile High from bringing its foreclosure action. We hold the district court's additional ruling on the affirmative defenses was in addition to, and not determinative of, its decision to grant declaratory judgment to Mr. Cohen. We nevertheless discuss the district court's application of the affirmative defenses to the facts of this case in order to

show the district court did not err in their application.

We review the district court's factual findings as to Mr. Cohen's equitable defenses under the clearly erroneous standard, and its legal conclusions *de novo*. *See Granite State Ins. Co. v. Smart Modular Tech., Inc.*, 76 F.3d 1023, 1028 (9th Cir. 1996). In finding the doctrine of laches applied, the district court first determined Mile High possessed actual knowledge of Mr. Cohen's notice of default, termination of the Lease Agreement, and claims he owed no money to Mile High. The district court then concluded Mile High's unreasonable delay in bringing its foreclosure action, when it knew of Mr. Cohen's claims, prejudiced Mr. Cohen who, in taking over the shopping center and expenses associated with it, relied on Mile High's acquiescence in relinquishing possession of the shopping center and not bringing suit. The district court further determined Mile High offered no plausible excuse for its delay. As to the defense of estoppel by acquiescence, the district court generally held Mile High was "estopped" from seeking foreclosure because it failed to timely take affirmative steps in filing its action against Mr. Cohen.

We begin by examining the issue of laches. As previously explained, under Wyoming law laches requires a finding of: 1) knowledge by the party against

-32-

which the defense is asserted; 2) acquiescence by that party in the assertion of its rights; 3) resulting unreasonable delay in bringing suit; and 4) prejudice to the party asserting the defense. *See Jicarilla*, 687 F.2d at 1338. Applying these elements to this case, it is clear Mile High knowingly relinquished possession of the shopping center on December 2, 1981. One month later, in January 1982, when Mile High refused to sign the necessary Mortgage release, it was fully aware of Mr. Cohen's claims concerning the termination of the Lease Agreement and cancellation of the Promissory Note and Mortgage. Moreover, Mile High remained cognizant of Mr. Cohen's possession of the shopping center and continued payments on the Jefferson Standard mortgage, as well as other expenses associated with the building. Nevertheless, Mile High did not initiate the instant foreclosure action for over eleven years. Clearly, Mile High knew of the relevant facts concerning any foreclosure action, yet acquiesced for an unreasonable length of time in asserting its perceived rights. No doubt exists that Mile High's unreasonable delay prejudiced Mr. Cohen, who continued to maintain the shopping center for over eleven years and fulfill his mortgage obligations with Jefferson Standard under the assumption Mile High was declining to assert its perceived rights. Accordingly, we hold the district court properly found the doctrine of laches applied and thereby estopped Mile High from seeking foreclosure.

As to the defense of estoppel by acquiescence, we have already determined the defense requires essentially the same elements of knowledge and acquiescence as required for laches. Thus, for primarily the same reasons stated above, we hold the equitable defense of estoppel by acquiescence may also apply in this case.[13]

## VI. CONCLUSION

The record and clear terms of the documents at issue support the district court's determination Mile High defaulted on the Lease Agreement and thereby forfeited the unpaid balance due under the Promissory Note and Mortgage. The record also supports the district court's finding the parties agreed to add the $50,000, paid by Mile High to Jefferson Standard, to the Mortgage between Mr. Cohen and Mile High and that Mile High's subsequent default of the Lease Agreement also resulted in forfeiture of its $50,000 payment. Finally, based on principles involving equity, the district court did not err in striking Mile High's jury demand and later applying either the affirmative defenses of laches or estoppel by acquiescence in precluding Mile High from seeking foreclosure of the

---

[13] We need not determine whether estoppel by acquiescence is an alternative defense to, or can be found in conjunction with, the defense of laches. Rather, under either defense, it is sufficient for us to hold the district court did not err in finding Mile High estopped from asserting its foreclosure action against Mr. Cohen.

Mortgage.  For these reasons, we **AFFIRM** the district court's declaratory

judgment in favor of Mr. Cohen.